**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and BRANCH, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**November 29, 2012**

# In the Court of Appeals of Georgia

A12A1195. NORFOLK SOUTHERN RAILWAY COMPANY v.
SUN CHEMICAL CORP. et al.

BRANCH, Judge.

Appellee Sun Chemical Corporation hired an ocean carrier to transport two containers of ink manufactured by Sun from Kentucky to Brazil. After the ocean carrier hired a freight forwarding company to arrange the shipment, the freight forwarder hired appellant Norfolk Southern Railway Company to carry the ink by rail from Kentucky to Savannah, where it would begin its ocean voyage to Brazil. The rail cars carrying the containers derailed, however, and the ink was destroyed. Sun and its insurer, Continental Insurance Company, sued Norfolk Southern for negligence and breach of contract. Sun moved for summary judgment on several theories, including that Norfolk Southern was strictly liable for the loss under the Carmack Amendment

to the Interstate Commerce Act, 49 U.S.C. § 11706. On appeal from the trial court's

grant of summary judgment to Sun on that basis, Norfolk Southern argues that it is not

subject to Carmack liability, that Sun should be bound by its agents' rejection of

Carmack coverage, and that Sun has no viable state law claim remaining. We agree

with these contentions and reverse.

The relevant facts are not in dispute. Sun entered into a contract with Compañia

Sud Americana de Vapores (CSAV), an ocean carrier, to transport Sun's ink. Under

what is known as a "through bill of lading," in which cargo owners "can contract for

transportation across oceans and to inland destinations in a single transaction,"[1] CSAV

took "responsibility for the entire (intermodal) transportation" of the ink from the

place of receipt to the place of final delivery, and retained "the right to use the services

of other Precarriers and/or Oncarriers and any mode of transport to accomplish the

---

[1] *Norfolk Southern R. Co. v. James N. Kirby, Pty Ltd.*, 543 U. S. 14, 26 (125 SC 385, 160 LE2d 283) (2004).

same."[2] The latter provision also includes a warning about the liability of such intermediate carriers:

> Custody and Carriage of the Goods during the intermodal transportation are subject to the tariffs and terms of the relevant bills of lading and/or contract of carriage and/or other transport documents adopted by the Precarrier or Oncarrier and prescribed or made compulsorily applicable by the country in which the intermodal transportation is performed. . . . *Particular attention of the Merchant is directed to the terms, conditions or provisions of such documents and laws of the country of transport*, as *the liability of the Precarrier and/or Oncarrier* under such terms, conditions or provisions *may be less than the liability of the Carrier in respect of the sea transport*.

(Emphasis supplied.) Sun also authorized CSAV to "subcontract *on any terms* the whole or any part of the handling and [c]arriage of the Goods and any and all duties whatsoever undertaken by [CSAV] in relation to the Goods." (Emphasis supplied.)

Under the authority thus granted it in the through bill of lading, CSAV subcontracted with Riss Intermodal, Inc., a freight forwarding company, to arrange

---

[2] The through bill of lading defines these terms as including "any carrier by land, water or air, which participates in the intermodal transportation of Goods moving under this Bill of Lading from the Place of Receipt to the Port of Loading in the case of the Precarrier and from the Port of Discharge to the Place of Final Delivery in the case of the Oncarrier." As Norfolk Southern points out, then, it is the "Precarrier" for purposes of this bill of lading.

3

inland transportation, which in turn hired Norfolk Southern to transport Sun's ink to

Savannah.[3] The intermodal transportation agreement (ISA) between Riss and Norfolk

Southern, which provided that it was "for the sole benefit of [Norfolk Southern] and

Riss," incorporated Norfolk Southern's rules circular governing such transport, which

offered customers a choice between "standard" and "Carmack" liability provisions.

The rules circular stated in boldface capitals that "unless language expressly selecting

'Carmack' is included in the original shipping instructions, any tender of freight for

transportation . . . will be accepted under 'standard' liability coverage provided and

not under 'Carmack' coverage."[4]

The ISA and the rules circular gave Riss the option to impose Carmack liability

on Norfolk Southern if Riss complied with certain additional procedures and paid a

higher rate. By contrast, the standard provision stated that Norfolk Southern "will not

---

[3] It does not appear from the parties' stipulated facts that Norfolk Southern issued its own bill of lading.

[4] As we explain in greater detail herein, "Carmack coverage" is strict liability imposed by the Carmack Amendment on the "receiving rail carrier" and "delivering rail carrier" for loss or damage of the freight at issue. See 49 U.S.C. § 11706 (a) (imposing liability "for the actual loss or injury to the property caused by (1) the receiving rail carrier; (2) the delivering rail carrier; or (3) another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.").

4

be liable for any loss, damage, or delay" to any party "other than the Rail Services Buyer." The record provides no evidence that Riss chose, paid for, or otherwise selected Carmack liability under the ISA or the rules circular.

In September 2001, Norfolk Southern cars carrying Sun's ink containers derailed while traveling through Washington County, Georgia, destroying the ink. Sun filed a claim with Continental Insurance Company, which paid Sun $60,593.44. Sun and Continental then sued Norfolk Southern for that amount plus interest and litigation costs. After the parties filed cross-motions for summary judgment, the trial court granted Sun's motion and denied Norfolk Southern's motion on the ground that Norfolk Southern was strictly liable under Carmack.

1. The primary question before us is whether Sun can be bound by Riss and Norfolk Southern's bargain, reached without notice to Sun, such that Norfolk Southern could not be held strictly liable under the Carmack Amendment.

We read United States Supreme Court precedent as authorizing parties to international intermodal transport agreements involving any "substantial carriage of goods by sea" to reach their own terms as to liability for damage or loss of cargo. *Norfolk Southern R. Co. v. James N. Kirby, Pty Ltd.*, 543 U. S. 14, 27 (125 SC 385, 160 LE2d 283) (2004). And the Court's recent decision in *Kawasaki Kisen Kaisha*

5

*Ltd. v. Regal-Beloit Corp*., __ U. S. __ (130 SC 2433, 177 LE2d 424) (2010), appears to have significantly limited Carmack's application to such agreements in an import context when it held that Carmack liability did not apply "if the property is received at an overseas location under a through bill [of lading] that covers the transport into an inland location in the United States." Id. at 2444 (IV) (A). Following *Kawasaki Kisen*, at least one federal district court has held that Carmack liability does not apply to a carrier hired by a freight forwarder under a through bill of lading concerning a freight shipment for maritime export (as is the case here), and the caselaw on which the trial court in our case based its decision to the contrary has been either abrogated or undermined by *Kawasaki Kisen*. For these reasons, which we explain more fully below, we conclude that the trial court erred when it concluded that Norfolk Southern was strictly liable under the Carmack Amendment for the loss of Sun's ink.

(a) We begin by considering how the two leading United States Supreme Court decisions on through bills of lading and Carmack liability – *Kirby* and *Kawasaki Kisen*, supra – apply to the case before us.

In *Kirby*, an Australian manufacturer hired a freight forwarding company, ICC, to arrange for delivery of its machinery from Sydney, Australia, through the port of Savannah to Huntsville, Alabama. *Kirby*, 543 U. S. at 18-19 (I). Like CSAV in this

6

case, ICC hired an independent contractor, Hamburg Sud, which in turn hired Norfolk Southern to transport the machinery from Savannah to Huntsville. Hamburg Sud's bill of lading with ICC limited its liability for the sea leg of the shipment to the default amount set by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 et seq., of $500 per package.[5] In a so-called "Himalaya clause,"[6] the bill of lading extended that liability limitation to all of Hamburg Sud's downstream agents and subcontractors, including inland carriers. Id. at 19-21. As in the case before us, the manufacturer sued Norfolk Southern for the value of the freight after it was damaged on the inland rail portion of its journey. Id. at 21. The Supreme Court held that the liability terms negotiated by Hamburg Sud (the independent contractor who hired Norfolk Southern) with ICC (the freight forwarder) were enforceable against the

---

[5] CVAS and Sun likewise agreed in the through bill of lading before us that COGSA "shall govern the Goods before they are loaded on and after they are discharged from the Vessel and throughout the entire time that they are in the custody of the Carrier at a United States port."

[6] "Clauses extending liability limitations take their name from an English case involving a steamship called Himalaya." (Citation omitted.) *Kirby*, 543 U. S. at 20 (I), n. 2. The through bill of lading before us also contains a clause to the effect that "[e]very employee, agent, sub-contractor and independent contractor of [CSAV] . . . used and employed by [CSAV] in the performance of this work . . . in relation to the Goods referred to herein . . . shall be a beneficiary of this Bill of Lading and *shall be entitled to all . . . limitations of liability which [CSAV] has under the provisions of this Bill of Lading.*" (Emphasis supplied.)

manufacturer because ICC had acted as the manufacturer's limited agent when making arrangements with downstream carriers, including Norfolk Southern. Id. at 33-34 (III) (B).

As a preliminary matter, and as the U. S. Supreme Court noted in *Kirby*, it is to a manufacturer's advantage to arrange both foreign and domestic components of transport "in one bill of lading, rather than to negotiate a separate contract – and to find an American railroad itself – for the land leg." 543 U. S. at 26 (II). Likewise, the independent contractor hired by the freight forwarder seeking to save the freight forwarder and its clients money by purchasing cheaper liability protection "would not enjoy the efficiencies of the [COGSA] default rule if the liability limitation it chose did not apply equally to all legs of the journey for which it undertook responsibility," with the consequence that "the apparent purpose of COGSA, to facilitate efficient contracting in contracts for carriage by sea, would be defeated." Id. at 29 (II). *Kirby* serves, therefore, to "reinforce the liability regime Congress established in COGSA" and "protect[ ] the uniformity of federal maritime law[.]" Id.; see also *Kossick v. United Fruit Co.*, 365 U.S. 731, 741 (6 LE2d 56, 81 SC 886) (1961) (even though a maritime contract involving substantial ocean transport "may well have been made anywhere in the world," it "should be judged by one law wherever it was made").

The *Kirby* Court's rationale for validating the Himalaya clause before it, which extended specific liability limitations to downstream carriers and agents, applies with equal strength to the provisions in the through bill of lading before us, which authorizes downstream carriers to reach their own liability terms:

> When an intermediary contracts with a carrier to transport goods, *the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed.* The intermediary is certainly not automatically empowered to be the cargo owner's agent in every sense. That would be unsustainable. But when it comes to liability limitations for negligence resulting in damage, *an intermediary can negotiate reliable and enforceable agreements with the carriers it engages*.

(Emphasis supplied.) Id. at 33 (III)(B). The Court went on to explain the justifications for this rule of "limited agency":

> First, we believe that a limited agency rule tracks industry practices. In intercontinental ocean shipping, carriers may not know if they are dealing with an intermediary, rather than with a cargo owner. Even if knowingly dealing with an intermediary, they may not know how many other intermediaries came before, or what obligations may be outstanding among them. If [traditional agency principles] were the law, carriers would have to seek out more information before contracting, so as to assure themselves that their contractual liability limitations provide true protection. That task of information gathering might be very costly

or even impossible, given that goods often change hands many times in the course of intermodal transportation. . . . .

Second, if liability limitations negotiated with cargo owners were reliable while limitations negotiated with intermediaries were not, carriers would likely want to charge the latter higher rates. A rule prompting downstream carriers to distinguish between cargo owners and intermediary shippers might interfere with statutory and decisional law promoting nondiscrimination in common carriage.

(Citations omitted.) Id. at 34-35 (III) (B). As the Court also noted, it "seems logical" that the hiring intermediary – "the only party that definitely knew about and was party to both of the bills of lading at issue here – should bear responsibility for any gap between the liability limitations in the bills," while the downstream carrier "enjoys the benefit" of the liability limitation reached by subcontract. Id. at 35 (III) (B).

Just as it alerted Sun to the extension of liability limitations to downstream agents and subcontractors, the through bill of lading issued by CSAV also brought Sun's attention to the possible differential between liability coverages for the land and sea portions of the ink's intermodal transport. Based on *Kirby* alone, then, Sun should be bound by Riss and Norfolk Southern's downstream agreement as to liability terms. See *Custom Rubber Corp. v. ATS Specialized*, 633 F. Supp. 2d 495, 512-513 (III) (C)

10

(N. D. Ohio, 2009) (owner gave up its right to choose between terms when it gave an intermediary broad authority to make shipping arrangements). However, *Kirby* does not address one question raised by these facts: that is, whether the Carmack Amendment's imposition of strict liability on receiving and delivering rail carriers preempts Sun's expressed intent to allow downstream carriers to make their own liability arrangements. For guidance on this question, we turn to the Carmack Amendment itself as recently construed by the United States Supreme Court in *Kawasaki Kisen*.

(b) As this Court has noted, the Carmack Amendment "codified the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by (a) [an] act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." (Citation and punctuation omitted.) *Transp. Solutions v. St. Paul Mercury Ins. Co.*, 297 Ga. App. 757, 758 (678 SE2d 201) (2009). First enacted in 1906 as an amendment to the Interstate Commerce Act (ICA) and frequently altered and recodified since then, the Carmack Amendment provides:

(a) A rail carrier providing transportation or service subject to the jurisdiction of the [Surface Transportation Board (STB)][7] . . . *shall issue a receipt or bill of lading for property it receives for transportation* under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the [STB] under this part . . . are liable to the person entitled to recover under the receipt or bill of lading. *The liability imposed* under this subsection is *for the actual loss or injury to the property* caused by (1) *the receiving rail carrier; (2) the delivering rail carrier; or (3) another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.*

(Emphasis supplied.) 49 U.S.C. § 11706.

The *Kawasaki Kisen* Court framed the question before it as "whether [the] Carmack [Amendment] applies to the inland segment of an overseas import shipment under a through bill of lading." *Kawasaki Kisen*, 130 SC at 2440 (I). Sun argues that under the plain language of the Carmack Amendment, Norfolk Southern is a "receiving rail carrier" to which Carmack liability must apply, regardless of any arrangements made by Sun's downstream carriers. As we read the *Kawasaki Kisen*

---

[7] As the successor to the Interstate Commerce Commission, the STB has exclusive jurisdiction to regulate rail transportation within the United States. *Kawasaki Kisen Kaisha*, 130 U. S. at 2441 (II) (B).

decision, however, the Court also answered the broader question of whether, in a case involving a through bill of lading for land and sea transit of goods, a domestic rail carrier not in privity with the owner of the goods could be subject to Carmack liability despite having made alternate contractual arrangements with the owner's agent in the negative.

The *Kawasaki Kisen* Court began its discussion by conceding that "[i]n cases where it applies," the Carmack Amendment imposes liability upon receiving and delivering rail carriers "for damage caused during the rail route under the bill of lading, regardless of which carrier caused the damage." (Citation omitted.) 130 SC at 2441 (II) (B). As prior precedent had established, this strict liability regime was designed to relieve cargo owners "'of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods.'" Id., quoting *Reider v. Thompson*, 339 U. S. 113, 119, 70 S. Ct. 499, 94 L. Ed. 698 (1950). "To help achieve this goal, Carmack constrains carriers' ability to limit liability by contract." *Kawasaki Kisen*, 130 SC at 2441 (II) (B), citing 49 U.S.C. § 11706 (c). Having recited the well-established policies animating the Carmack Amendment, the *Kawasaki Kisen* Court turned its attention to the threshold

13

but critical inquiry as to which carriers should be subject to Carmack liability pursuant to 49 U.S.C. § 11706:

> First, the rail carrier must 'provid[e] transportation or service subject to the jurisdiction of the [STB].' Second, that carrier must 'receiv[e]' the property 'for transportation under this part,' where 'this part' is the STB's jurisdiction over domestic rail transport. *Carmack thus requires the receiving rail carrier – but not the delivering or connecting rail carrier – to issue a bill of lading. . . .* [A]scertaining the shipment's point of origin is critical to deciding whether the shipment includes a receiving rail carrier.

(Emphasis supplied.) Id. at 2443 (II) (A), quoting 49 U.S.C. 11706 (a).

The Court thus read the first sentence of the Amendment as providing that "Carmack's bill of lading requirement only applies to the receiving rail carrier" – that is, the "initial carrier" receiving the property "for domestic rail transportation at the journey's point of origin," and not merely "any carrier that in the colloquial sense 'received' the property from another carrier."(Citation omitted.) Id. at 2443 (IV) (A). The Court explained that only this narrower definition of "receiving rail carrier" comported with the Carmack Amendment's policy of "making the receiving and delivering carriers liable under a single, initial bill of lading for damage caused by any carrier within a single course of shipment." Id. Although the Court held that the

14

Carmack Amendment continued to apply "to transport of property for which Carmack requires a receiving carrier to issue a bill of lading, regardless of whether that carrier fails to issue such a bill," the Court concluded that Carmack "does not apply if the property is received at an overseas location under a through bill that covers the transport into an inland location in the United States." Id. at 2444 (IV) (A). In the instant case, CSAV, the initial carrier, issued the through bill of lading; Norfolk Southern did not.

Although the *Kawasaki Kisen* Court explicitly declined to address the fact pattern before us – that is, one in which "goods are received at a point in the United States for export," 130 SC at 2444 – at least one federal court applying both *Kirby* and *Kawasaki Kisen* has characterized freight shipments originating in the United States but reaching overseas destinations as essentially "maritime contracts" to which Carmack does not apply.[8] In *Hartford Fire Ins. Co. v. Expeditors Int'l of Washington*, __ F.Supp.3d __ (2012 U. S. Dist. LEXIS 96974, S.D.N.Y. July 9, 2012), an owner

---

[8] Although we would normally turn to the Eleventh Circuit for guidance on questions of federal law, none of the opinions from that circuit citing *Kawasaki Kisen* mention the Carmack Amendment. See *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257 (11th Cir. 2011); *UTI, United States, Inc. v. Bernuth Agencies, Inc.*, 2012 U. S. Dist. LEXIS 141520 (S.D. Fla. Oct. 1, 2012); *Underwriters &c. v. Seatruck*, Inc., 858 F. Supp. 2d 1334 (S.D. Fla. 2012).

15

of solar panels (Evergreen) contracted with a freight forwarding company (Expeditors) to carry empty containers to Evergreen's warehouses in Massachusetts and then to ship the containers, now filled with solar panels, to a port in the New York area, from which the containers were to be shipped to their final destination in France. Id. at ** 2, 3, 16. A through bill of lading authorized Expeditors "to sub-contract on any terms the whole or any part of the handling, storage or carriage of the [containers] and any and all duties whatsoever undertaken by the [c]arrier in relation to [them]." Id. at *6. Expeditors then hired Intransit to handle the inland portions of this intermodal transport. When the panels were found to be damaged on their arrival in France, Evergreen's insurer sued Intransit for liability as a receiving carrier under Carmack. Id. at **1, 2.

Applying *Kawasaki Kisen*, the federal court found that Intransit could not be held liable under Carmack. The court noted that as a freight forwarder, Expeditors was "'both the receiving and the delivering carrier'" for purposes of the Carmack Amendment, id. at *16, quoting 49 U.S.C. § 14706 (a) (2),[9] with the result that

---

[9] Although *Expeditors* concerned a motor carrier rather than a rail carrier, it is well-settled that the Carmack Amendment applies to both kinds of transport. See *Expeditors* at *12, citing *Royal & Sun Alliance Ins. v. Ocean World Lines*, 612 F.3d 138, 145 (2d Cir. 2010).

16

Intransit was merely "an intermediate carrier" not subject to Carmack liability. More broadly, the trial court noted that the owner sued under a bill of lading issued by Expeditors and was thus bound by its terms, including Expeditors' power to issue subcontracts on any terms and Evergreen's indemnification of any claims against Expeditors. See id. at *6. Finally, citing both *Kirby* and *Kawasaki Kisen*, the court held that "[w]here a bill of lading 'requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce[,] and thus . . . is a maritime contract'" to which Carmack does not apply. Id. at *18, quoting *Kirby*, 543 U. S. at 27 (II).

Although the United States Supreme Court's decision in *Kawasaki Kisen* appeared months before the Georgia trial court's decision in the case before us, the Georgia trial court did not have the benefit of the Southern District of New York's *Expeditors* decision at the time it ruled. Instead, the trial court based its imposition of Carmack liability on two earlier Southern District of New York decisions: *Sompo Japan Ins. Co. v. Norfolk S. R. Co.*, 540 F.Supp.2d 486 (S.D.N.Y. 2008), a decision abrogated by *Kawasaki Kisen*, and *Amer. Home Assur. Co. v. Panalpina*, 2011 U. S. Dist. LEXIS 16677 (S.D.N.Y. 2011), which relied on *Sompo*.

*Sompo* addressed whether a shipper could recover from a rail carrier under Carmack for damage sustained on the concluding inland leg of a freight shipment

17

from Asia to Georgia. 553 F.Supp.2d 348, 349 (S.D.N.Y. 2008). On motion for reconsideration, the district court affirmed its earlier holding that as the delivering rail carrier, Norfolk Southern was liable under Carmack. Id. at 350-351. The Second Circuirt vacated and remanded for further proceedings in light of *Kawasaki Kisen*. *Nipponkoa Ins. Co. v. Norfolk Southern R.*, 394 Fed. Appx. 751-752 (2d Cir. 2010). On remand, the district court concluded that in light of *Kawasaki Kisen*, Carmack "does not apply to a shipment originating overseas under a single through bill of lading." *Sompo*, 2012 U. S. Dist. LEXIS 125398 at *10.

The *Panalpina* decision applied Carmack liability to a motor carrier hired by a freight forwarder to transport containers from Illinois to California en route to Australia. *Panalpina*, supra at **4, 5. In a holding that seems contrary to both the rationales and the policy concerns of *Kirby* and *Kawasaki Kisen*, the *Panalpina* court concluded that because the rail carrier "received the property for transportation" subject to federal regulation, it was liable under the Carmack Amendment. Id. at *14; compare *Kawasaki Kisen*, 130 SC at 2447 (applying the Carmack Amendment to international shipping transport "would undermine the 'purpose of COGSA, to facilitate efficient contracting in contracts for carriage by sea,'" quoting *Kirby*, supra at 29 (II)).

18

(c) We think that the Southern District of New York's more recent decision in *Expeditors* implements *Kirby*'s and *Kawasaki Kisen*'s objectives of promoting efficient maritime contracting more effectively than the earlier *Panalpina* decision, and that federal law requires us to uphold the bargained-for terms of the through bill of lading before us, including its binding of Sun to its downstream agent Riss's refusal of the Carmack liability offered by Norfolk Southern.

It is undisputed that Sun, the owner and shipper of the ink at issue here, hired CSAV, an ocean carrier, to transport that ink by sea from Sun's Kentucky facility to Brazil. Sun was then issued a through bill of lading by CSAV, which then made arrangements to transport the ink from Kentucky to the port of Savannah, where it would begin the greater part of its journey to Brazil. Sun gave explicit permission in the through bill of lading issued to it that CSAV could "subcontract *on any terms* the whole or any part of the handling and carriage" of the ink; that CSAV had "the right to use the services" of other subcontractors "and any mode of transport to accomplish the same"; and that the terms set further down the stream of commerce could render the subcontractor's liability "less than the liability of [CSAV]" concerning the sea leg of the transport. Like the *Kirby* Court, then, but contrary to the trial court in this case, we construe the bill of lading issued by the ocean carrier which is before us, including

19

its land components, as a "maritime contract" governed by federal law. See id. at 24 (II) (*Kirby* bills of lading were "maritime contracts because their primary objective is to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States"); *Expeditors* at *18 (Carmack does not apply to "what are essentially maritime contracts").[10]

We also believe that as the issuer of the bill of lading after negotiations with Sun, CVAS, and not Norfolk Southern, is the "receiving carrier" to whom Carmack liability could apply but does not, for the reasons we have outlined above. See *Kawasaki Kisen*, 130 SC at 2443 (IV) (A) (Carmack requires the "receiving rail carrier – but not the delivering or connecting rail carrier – to issue a bill of lading"). As in *Expeditors*, moreover, Norfolk Southern and Riss reached their own agreement as to the inland leg of what was supposed to be an extensive maritime transport from Kentucky to Brazil via Savannah. Finally, having been granted the authority by Sun

---

[10] In making this determination, we are mindful that federal cases "do not draw clean lines between maritime and non-maritime contracts" and that "the boundaries of admiralty jurisdiction over contracts – as opposed to torts or crimes – being conceptual rather than spatial, have always been difficult to draw." (Citation and punctuation omitted.) *Kirby*, 543 U.S. at 23 (II). "[T]he answer depends upon the nature and character of the contract, and *the true criterion is whether it has reference to maritime service or maritime transactions*." (Citation and punctuation omitted; emphasis supplied.) Id. at 24 (II).

to reach its own terms with subcontractors, Riss declined Norfolk Southern's offer of a right to assert a Carmack claim against it, choosing a less expensive liability regime instead. See *Expeditors* at ** 6 (noting carrier's power to subcontract "on any terms" with other carriers) and **17, 18 (noting that the freight owner had sued under a bill of lading issued by the freight forwarder Expeditors and "thus[] is bound by its terms"); 49 U.S.C. § 10709 (a), (b) (a rail carrier who "enter[s] into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions . . . shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract").[11]

---

[11] Federal law provides at least two options for contracting around the strict liability provisions of Section 11706. Although 49 U.S.C. § 10502 (e), known as the Staggers Act, provides that the STB may not "relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of [Carmack]," the same subsection provides that "[n]othing in this subsection or [Carmack ] . . . *shall prevent rail carriers from offering alternative terms nor give the Board the authority to require any specific level of rates or services based on the provisions of [Carmack]*." (Emphasis supplied.) Likewise, 49 U.S.C. § 10709 (a) specifies that "[o]ne or more rail carriers providing transportation subject to the jurisdiction of the Board . . . may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions." Having signed such a contract, a rail carrier "shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract." 49 U.S.C. § 10709 (b).

We therefore conclude that Norfolk Southern, which was brought into an international ocean shipping arrangement two transactions after CSAV had issued its bill of lading, cannot be subject to Carmack liability because (1) the bill of lading issued by CSAV is a "maritime contract" to which Carmack liability should not apply; (2) Norfolk Southern was not the "receiving carrier" of the ink containers for purposes of Carmack liability; and (3) Sun authorized downstream carriers to reach their own terms as to liability, which Riss did when it declined Norfolk Southern's offer of Carmack liability. The trial court erred when it reached a contrary conclusion.

2. As this Court has noted, the Carmack Amendment "controls the liability of a carrier for damage to or loss of an interstate shipment of goods, and *generally preempts separate state-law causes of action by a shipper against a carrier for the lost or damaged goods*." (Citations omitted; emphasis supplied.) *Transp. Solutions*, 297 Ga. App. at 758. Pretermitting whether the Amendment and other federal law preempts Sun's state law claims, however, we conclude that they lack merit.

(a) Norfolk Southern argues that Sun should be bound by its subcontractors' agreement that Norfolk Southern would not be liable for any loss to anyone other than Riss. Given our conclusion in Division 1 that the Carmack Amendment does not trump Sun's explicit authorization that its downstream subcontractors could reach

22

their own liability terms, the bill of lading's covenant that Sun could sue only the ocean carrier (CVAS) and/or the immediate buyer of Norfolk Southern's rail services (Riss) is enforceable against Sun. See *St. Paul Travelers Ins. Co. v. M/V Madame Butterfly*, 700 F. Supp. 2d 496, 505 (III) (A) (S.D.N.Y. 2010) (because a bill of lading contained a "broad clause prohibiting suits against persons other than the carrier," an owner was "precluded from suing" the carrier's subcontractors) (footnote omitted).

(b) Sun's bailment claim against Norfolk Southern fails as well. In order to state a claim for negligence or breach of bailment, Sun must show that it was owed a duty by Norfolk Southern and that the latter breached that duty. *AAA Parking v. Bigger*, 113 Ga. App. 578, 583 (2) (149 SE2d 255) (1966). But Norfolk Southern's duty with respect to the ink shipment is set out in its contract with Riss, as to which Sun is neither a party nor, as the contract itself specified, a third-party beneficiary. See OCGA § 44-12-40 (a bailment is "a delivery of goods or property upon a contract, express or implied"); *Owners Ins. Co. v. Smith Mech. Contractors*, 285 Ga. 807, 809 (2) (683 SE2d 599) (2009) (citing OCGA § 44-12-40).

For all these reasons, the trial court erred when it granted Sun and Continental summary judgment on its claim under the Carmack Amendment against Norfolk

Southern. We therefore reverse that judgment and remand the case with direction that judgment be entered in favor of Norfolk Southern.

*Judgment reversed and case remanded with direction. Ellington C. J., and Phipps, P. J., concur.*