*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0053p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CNA INSURANCE COMPANY, a/s/o Corning, Inc.,

     *Plaintiff-Appellee/Cross-Appellant,*

     *v.*

HYUNDAI MERCHANT MARINE CO., LTD.; NORFOLK SOUTHERN RAILWAY COMPANY; BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY,

     *Defendants-Appellants/Cross-Appellees.*

Nos. 12-6118/6201

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:07-cv-00141—Charles R. Simpson III, District Judge.

Argued: July 24, 2013

Decided and Filed: March 26, 2014

Before: BATCHELDER, Chief Judge; COOK and O'MALLEY, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Paul D. Keenan, KEENAN COHEN & HOWARD P.C., Jenkintown, Pennsylvania, for Appellants/Cross-Appellees. Edward C. Radzik, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, New York, New York, for Appellee/Cross-Appellant. **ON BRIEF:** Paul D. Keenan, KEENAN COHEN & HOWARD P.C., Jenkintown, Pennsylvania, for Appellants/Cross-Appellees. Edward C. Radzik, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, New York, New York, Henry S. Alford, Rebecca Grady Jennings, MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellee/Cross-Appellant.

     BATCHELDER, C.J., delivered the opinion of the court in which COOK, J., concurred, and O'MALLEY, J., concurred in part. O'MALLEY, J. (pp. 51–54), delivered a separate opinion dissenting from section III.B of the majority's opinion.

_____

[*]The Honorable Kathleen M. O'Malley, Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

---

**OPINION**

---

ALICE M. BATCHELDER, Chief Judge.  At its core, this appears to be a simple case: Corning hired Hyundai to transport cargo overseas, Hyundai's subcontractors accidentally destroyed the cargo during transit, and nobody wants to pay for it.  After some significant legal decisions and a jury trial, the district court found Hyundai and the subcontractors liable to CNA for the loss, though it refused CNA's request for prejudgment interest.  Both sides appeal and, as one might expect, this is not nearly as simple as it would seem.  Based on the reasoning that follows, we AFFIRM in part, REVERSE in part, and REMAND for reconsideration consistent with this opinion.

**I.**

The Corning facility in Harrodsburg, Kentucky, makes 4-foot by 4-foot sheets of very thin fusion-drawn flat-glass for use in LCD flat-screen televisions and computer monitors.[1]  Corning packs these sheets into custom-made wooden crates, each holding approximately 500 sheets.  These crates are sized so that exactly 12 (three across and four deep) fit into a standard 20-foot steel intermodal shipping container leaving only negligible space (less than four inches).  This is called "cubing out" the shipping container and eliminates the need for additional packing or securing.

Corning ships its glass, in these containers, to Corning Display Technologies in Tainan, Taiwan (an entirely separate company), which buys all the glass that Corning can produce and also buys more from other vendors.  Consequently, Corning ships as many containers per day as it can fill, usually several, and has been doing so for years.  Despite the expected fragility of such thin glass and the high volume of shipments, Corning has had virtually no problems with shipping by rail and the damage rate has been extremely low (estimated at one or two sheets for every few crates).

---

[1]Each sheet is actually 1300 mm x 1340 mm, or approximately 4'3" x 4'5".  And each sheet is 0.635 mm thick, or 0.025 inches thick, which is thinner than typical posterboard (which is 1/32 inch, or 0.03125 inches, thick).

As of 2006, Corning and Hyundai Merchant Marine had for several years been parties to a Service Contract in which Corning agreed to ship and Hyundai agreed to carry Corning's cargo from certain locations in the United States to certain locations in Asia: specifically, as relevant here, from Harrodsburg to Tainan for the shipment of the aforementioned glass (and the return shipment of the empty crates).[2]  Corning dealt exclusively with Hyundai as the sole carrier for a through shipment; Corning had no role in selecting or contracting with any other carriers in the chain; and Corning made a single payment to only Hyundai.  The Service Contract contained other pertinent provisions:

4.A.    "[Hyundai] shall be deemed an independent contractor with respect to [Corning] and nothing herein contained shall be construed to be inconsistent with that relationship or status. . . ."

9.A.    "Indemnification — [Hyundai] shall indemnify and hold [Corning] harmless from any and all liability, expense (including reasonable attorney's fees), cause of action, suit, claim or judgment . . ."

13.A    "Choice of Law — This Agreement shall be, insofar as relevant, governed by the terms of the Shipping Act of 1984, and otherwise by the laws of the State of New York and of the United States of America."

15.C.    Incorporates Hyundai's Regular Form Bill of Lading provisions, unless they conflict, in which case the terms of the Service Contract control. (The only relevant conflict here is that this Service Contract expressly deems Hyundai as Corning's independent contractor, whereas the Hyundai Regular Form Bill of Lading attempts to deem Hyundai as Corning's agent).

---

[2]While the fact that the contract includes return carriage of the crates from Tainan to Harrodsburg could affect the analysis that follows, we find that it does not affect the outcome of this decision so we will not discuss it further.

The Hyundai Regular Form Bill of Lading[3] contains certain pertinent provisions as well:

2(B).  Clause Paramount — extending COGSA[4] to cover all times "when the goods are in the custody of [Hyundai]."

4.   Subcontracting —

(B)   "[Hyundai] shall be entitled to subcontract on any terms the whole or any part of the handling, storage[,] or carriage of the Goods and any duties undertaken by [Hyundai] in relation to the Goods."

(C)   "[Corning] warrants that no claim shall be made against any of [Hyundai]'s Subcontractors or any Subcontractor's Subcontractor, except Carriers where otherwise appropriate, . . . If any such claims should nevertheless be made, [Corning] shall indemnify [Hyundai]. . . ."

(D)   Himalaya Clause — "Without prejudice to the foregoing, in regard [to a claim] against a Subcontractor regarding handling, storage[,] or carriage of the Goods, every such Subcontractor shall have the benefit of all provisions in this Bill of Lading as if such provisions were expressly for the Subcontractor's benefit."

5.   Responsibility for Loss or Damage —

(B)(2)  "If [Corning] establishes that [Hyundai] is liable for the . . . damage to . . . the Goods, and subject to the provisions of this Bill of Lading, including Article 21; . . . [then] with respect to . . . damage caused during the handling, storage, or carriage of the Goods by [Hyundai]'s Subcontractor, such liability shall be to the extent to which such Subcontractor would have been liable to [Corning] if it had made a direct and separate contract with [Corning] in respect of such handling, storage, or carriage."

---

[3]The record contains two slightly different versions of Hyundai's Regular Form Bill of Lading. We are using the version used by the district court, as the parties expressed no objection to that choice in either the district court or here.  More importantly, the differences in the versions do not change the substance of the agreement as pertinent here.

[4]COGSA is the Carriage of Goods by Sea Act, 46 U.S.C. § 30701.  The key feature of COGSA, as it pertains here, is that it allows the ocean carrier to limit its liability and even sets out a default limitation of liability of $500 per package while the cargo is on the ship ("between the tackles").  COGSA also allows the ocean carrier to extend this limitation of liability to the overland portions of the journey ("beyond the tackles") with a properly written Clause Paramount in the bill of lading.  This feature of COGSA makes the Clause Paramount particularly important.

21.    Limitation of Liability for Loss or Damage –

(A)    "Subject to subpart (B) below, for the purpose of determining the extent of [Hyundai]'s liability for . . . damage to the Goods, [Corning] agrees that the sound value of the Goods is [Corning]'s net invoice cost, plus freight and insurance premium, if paid. [Hyundai] shall not be liable for any loss of profit or any consequential loss."

(B)    "Insofar as . . . damage to . . . the Goods was caused during the part of the custody or carriage to which the applicable version of the Hague Rules applies:

(1)  "Neither [Hyundai] nor the Vessel shall be liable for . . . damage in an amount exceeding the minimum allowable limit per package . . . , which [under] COGSA . . . is U.S. $500 per package, . . . unless the value (and nature) of the Goods higher than this amount has been declared in writing by [Corning] before receipt of the Goods by [Hyundai] and inserted on the face of this Bill of Lading, and extra freight has been paid as required. . . ."

(2)  "Where the Goods have been packaged into a container . . . by or on behalf of [Corning], it is expressly agreed that the number of such containers . . . shall be considered to be the number of packages . . . for the . . . application of th[is] limitation of liability. . . ."

It is undisputed that this Service Contract governs the claims in this case.

Based on this Service Contract — which anticipated the shipment of multiple 20-foot-standard shipping containers, every weekday, from the Corning facility in Harrodsburg, Kentucky, to Corning Display Technologies in Tainan, Taiwan — Hyundai coordinated or performed each of the six (6) legs of this journey, as an intermodal shipment via a single through bill of lading.

Hyundai subcontracted with a motor carrier (DHL) to pick up the containers at Corning's facility in Harrodsburg and drive them to the railhead in Louisville. A single truck would carry a single container, and Corning would provide the driver with a "straight" bill of lading for the journey to Louisville, as verification that the cargo in the

sealed container departed in good condition. The truck driver did not issue a bill of lading to Corning, in its own right or on behalf of Hyundai.

Hyundai subcontracted with a rail carrier (Norfolk Southern Railway Co., pursuant to an "Intermodal Transportation Agreement," which incorporates Norfolk Southern's Rules, including an option to select Carmack-based liability[5] at a higher price, which Hyundai did not select[6]) to unload the containers from the truck at the Louisville railhead, load them onto a flatcar, and carry the containers by train to Chicago. It is noteworthy that standard flatcar loading for such containers provides for three (3) containers per flatcar: two (2) 20-foot containers placed on the flatcar with their "noses" (closed ends) touching in the middle so that their doors are exposed at either end, and a 40-foot container placed on top of the two 20-foot containers. All containers remain sealed. Norfolk Southern did not issue any bill of lading, either in its own right or on behalf of Hyundai.

Hyundai subcontracted with another rail carrier (Burlington Northern Santa Fe Railway Co., "BNSF," pursuant to an "International Transportation Agreement," which incorporates BNSF's Rules and also offers the option to select Carmack liability at a higher price, which Hyundai did not select) to take possession of the flatcar in Chicago and carry the containers by train to the railhead in Tacoma, Washington. The containers were not removed from the flatcar; the entire flatcar was transferred into BNSF's custody (a "steel wheel" interchange). It is noteworthy that both Norfolk Southern and BNSF maintain detailed records, via computer, of the handling of the trains and railcars, including movement on the line and at the terminal, coupling and decoupling, and any

---

[5]The Carmack, 49 U.S.C. § 11706, liability scheme, particular to road and rail carriers under the jurisdiction of the United States Surface Transportation Board (STB), is central to this appeal and is introduced in Section II.A, *infra*.

[6]This is noteworthy because the Surface Transportation Board has permitted rail carriers to avoid Carmack liability for container carriage, so long as the carrier offers Carmack coverage (even at a higher price) to the shipper and the shipper declines. *See Babcock & Wilcox Co. v. Kan. City S. R.R.*, 557 F.3d 134, 142 n.6 (3d Cir. 2009) (relying on 49 U.S.C. § 10502(e) and § 11706). Here, both rail carriers offered Carmack coverage to Hyundai (at a higher price) and Hyundai declined — but neither rail carrier nor Hyundai ever offered a Carmack coverage option to Corning.

rough handling.  BNSF did not issue any bill of lading, either in its own right or on behalf of Hyundai.

Hyundai had a third rail carrier (Tacoma Municipal Beltline Railway, "TMBR," apparently a wholly-owned subsidiary of Hyundai) take possession of the flatcar at the railhead in Tacoma and carry the containers by train to the Washington United Terminal (WUT) seaport.  Because TMBR operates over two hundred miles of rail in and around the Tacoma railhead and seaport, it appears that this was necessary carriage and not merely a switching service.  TMBR did not issue any bill of lading, either in its own right or on behalf of Hyundai.

Hyundai, an ocean carrier, would unload the containers from the railcars at the WUT seaport and load them onto a ship for sea carriage to the seaport in Kaohsiung, Taiwan.  It is at this point that Hyundai would issue a bill of lading specific to the cargo at hand.  This was an "ocean" bill.

Hyundai subcontracted with a motor carrier (not named in the record, and terms unknown) to pick up the containers at the Kaohsiung seaport and carry them by truck to Corning Display Technologies in Tainan, Taiwan.[7]  Nothing in the record suggests that this motor carrier issued any bill of lading, either in its own right or on behalf of Hyundai.  To summarize the six legs of the journey:

1.     DHL motor carriage (truck) – Harrodsburg to Louisville;

2.     Norfolk Southern rail carriage (train) – Louisville to Chicago;

3.     BNSF rail carriage (train) – Chicago to Tacoma;

4.     TMBR rail carriage (train) – Tacoma to WUT seaport;

5.     Hyundai sea carriage (ship) – WUT to Kaohsiung, Taiwan, seaport;

6.     Unknown motor carriage (truck) – Kaohsiung to Tainan.

This journey would take weeks to complete, door-to-door from Harrodsburg to Tainan.

---

[7]It is suggested in the record that Hyundai did not subcontract this part of the trip, and that either Corning or Corning Display Technologies contracted with this motor carrier directly.  Either way, it is not relevant to the analysis herein.

On February 21, 2006, Corning shipped several standard 20-foot containers, as it had done every weekday for years, but unlike those thousands of other shipments, two of these containers (identified as HMDU2347259 and HMDU2262167) were damaged on the way to Tainan.

As was usual, Corning prepared its own straight bill of lading for each container. Each truck driver signed the Corning straight bill upon accepting the container, thus acknowledging that he had received the container from Corning in good condition. Neither truck driver issued Corning a bill of lading; in fact, no carrier ever issued a bill of lading for any cargo at any point during this shipment. Correspondingly, Corning never declared a value for this cargo prior to shipment.

The truck drivers transferred the containers to Norfolk Southern in Louisville on that same day, February 21, 2006. Norfolk Southern placed both containers on the same flatcar, presumably — because the record contains no evidence to the contrary — with noses touching in the middle and a 40-foot container set on top. Norfolk Southern did not record or report any damage to either container at that point. Norfolk Southern transferred the flatcar to BNSF in Chicago on February 26, 2006. BNSF did not record or report any damage to either container at that point. BNSF transferred the flatcar to TMBR in Tacoma on March 4, 2006. TMBR did not record or report any damage to either container at that point. These containers were intended to be loaded onto the Hyundai vessel "Hyundai Duke" for overseas shipment to Taiwan.

On March 5, 2006, Hyundai unloaded the containers from the flatcar onto the dock. Sometime thereafter, a WUT employee observed that the two containers were visibly damaged; the front (nose) end of each container was "bulging," or buckled outward. When the containers were opened for inspection, it was discovered that some of the wooden crates were visibly damaged and some of the glass within had broken. There was no report of any damage to any other container on any other car from this train (including the 40-foot container presumably set atop these two).

On March 7, 2006, Marc Cash, the "Assistant Manager for Outbound Trouble Shooting" for Hyundai, sent an email to Corning, to inform Corning of the situation:

Good afternoon, please note that the below 2 units arrived via the rail into WUT and the container were bulging, which is an indicator that the cargo may not have been properly secured.

HDMU2347259

HDMU2262167

. . .

Upon consultation with HMMA/Claims,[8] we are arranging a survey and Transload to take place tomorrow, Wednesday March 8th approximately 1:00 PM.  I will be speaking with the surveyor directly after the initial viewing, and will be able to provide further evidence of the cause.  Since the commodity is shown as 'Flat Glass', it is possible there may be some cargo damage.

Hyundai contracted Craig Burgess of Cullen Maritime Services, Inc. (Seattle, Washington), to perform an on-site survey of the damage.  Burgess confirmed that both containers and four (4) of the crates within were visibly damaged and speculated that the damage was due to aggressive "humping" during the rail carriage.  Humping is a means of moving and connecting rail cars during transfer or interchange in which the cars come to a sudden stop.  Burgess also opined that the loading and packing of the crates within the containers, by Corning in Harrodsburg, appeared to have been satisfactory.  The record does not contain a written report by Burgess or Cullen Maritime.

On March 10, 2006, Marc Cash sent a follow-up email to John Wagner of Corning to report on the information obtained from Burgess:

Good afternoon John, pleasure to speak with you today.
As per our telecon, the Transload and Survey took place 3/9, and the results were that in the opinion of the surveyor the bulging of the nose of the 2 containers was due to aggressive humping of the Flatcars by the rail carriers.  The surveyor found no issue with your loading and stowage of the cargo in the containers.

Apparently, Cash sent photos of the damage (both containers and crates) to Wagner sometime thereafter and, on March 14, 2006, Wagner responded to Cash via email:

---

**8** "HMMA/Claims" refers to the Hyundai Merchant Marine of America, Inc. Claims Department.

Marc:
I have shared the photos of the damaged crates with our plant in Harrodsburg, KY. The amount of force the product was subjected to in the humping incident has likely damaged the glass. There is reason to suspect that any or all of the crates have damage from the shock, not just the four where you found the external splintering of the wood. I would like both containers returned to origin for inspection at no cost to Corning.
Please advise arrangements and ETA so we can plan for the inspection.
If damage is found we will be processing a claim.

Note that, at this point, both Cash (Hyundai) and Wagner (Corning) had accepted that a rail carrier's humping of the flatcars caused the damage. But later (much later, it turns out), Norfolk Southern and BNSF disproved this assumption by producing logs to show that no humping or rough handling had occurred during the carriage of these two containers. Cash replied to Wagner that same day:

Good afternoon John, please note the we will make immediate arrangements to return these 2 containers to Harrodsburg, KY for further examination.
Please note that I have spoken to, and added to this distribution, personnel from our National Claims Dept. for further coordination and direction from this point forward to ensure smooth handling of any concerns. The contact person for HMMA Claims is as follows:
Mr. Todd Frare
. . .
I will advise once cargo is railbilled and scheduled to depart Tacoma for Harrodsburg, KY.

Hyundai unloaded the 24 crates from the damaged containers, loaded them into two different containers, and shipped them back to Harrodsburg, via the same route by which they had arrived. Meanwhile, Corning filed an insurance claim with its insurer, CNA. When the cargo arrived back in Harrodsburg, CNA scheduled its own survey of the crates to fully assess the damage.

Mark Ohlson of Riverlands Marine Surveyors and Consultants, Inc. (Louisville, Kentucky), conducted a survey on March 31 and April 6, 2006, and prepared a written report dated April 19, 2006 (Riverlands Report), for CNA. In the Riverlands Report, Ohlson noted that Robert Craig, a Marine Surveyor representing Hyundai, was also

present. When Corning opened the containers and removed the crates, Ohlson found that all but four (4) of the 24 crates exhibited visible damage to the crate itself or the glass inside. When they opened two (2) of the apparently undamaged crates for inspection, both revealed damaged glass. Ohlson attributed the damage to the likelihood of "humping" during the rail transport, but this was almost certainly based not on any evidence but on Burgess's speculation during the initial on-site survey in Tacoma and Cash's adoption and repetition of that assertion in his email to Corning. Ohlson also opined that Corning's method of stowing and packing had been suitable for the shipping.[9] Finally, Ohlson declared the shipment a total loss and recommended that the glass be disposed of and the crates returned to their manufacturer for refurbishment.

CNA paid Corning $664,679.88 on the claim and was subrogated to Corning's right to sue for recovery. On September 27, 2006, CNA filed suit in the Southern District of New York, naming three defendants: Hyundai, Norfolk Southern, and BNSF (hereinafter "the Carriers"). CNA claimed breach of the Service Contract, liability for bailment, and negligence. CNA cited the Carmack Amendment, 49 U.S.C. § 11706, in the opening paragraph (jurisdiction section) of its complaint.

The Carriers moved to transfer venue to the Eastern District of Kentucky, arguing that it would have been an appropriate venue originally and would be more convenient for the parties and any witnesses, given that the carriage began at the Corning facility in Harrodsburg, in the Eastern District of Kentucky. CNA opposed the transfer and moved, in the alternative, for a transfer to the Western District of Washington, where the damage was discovered. The animosity between the attorneys, if not the parties, became clear immediately. The court "granted" the Carriers' motion and transferred the case, not to the Eastern District as requested, but to the Western District of Kentucky, specifically Louisville. While this appears to have been a mistake, the parties proceeded in the Western District of Kentucky, and any objection or error has long since been waived.

---

[9]Given that Hyundai personnel had loaded the crates into new containers in Tacoma for return shipment, this assertion was based either on Corning's standard practices or the statement from the initial on-site survey in Tacoma.

The Carriers moved for summary judgment on three bases:  (1) that CNA had not pled Carmack claims, so the absence of contractual privity prevented CNA from suing the rail carriers; (2) that the Service Contract's[10] Subcontracting Clause prohibited CNA from suing the rail carriers; and (3) that the Carriers were entitled to enforcement of the $500-per-package COGSA limitation of liability, arguing for a limit of $12,000 for the 24 crates.[11]  The district court rejected the Carriers' argument that CNA had not pled Carmack claims, found that CNA had done so, and held that the case would proceed solely under Carmack, apparently on the basis that the damage had undisputedly occurred while the cargo was in the possession of a rail carrier.[12]  The court next

---

[10]Unless specified, any reference to the Service Contract includes reference to the Form Bill of Lading, which was specifically incorporated therein, except for provisions that conflicted with the Service Contract itself.

[11]It is unclear why the Carriers' attorney sought $500 per crate ($12,000) when the limitation of liability provision (Form Bill of Lading § 21(B)(2), as incorporated into the Service Contract) specifically states that a "package" is a "container" packed by Corning, which at least implies that there were actually only two such "packages" damaged here.  Thus, under a strict reading, Hyundai would have been liable for only $1,000 on this shipment.

[12]On appeal here, the Carriers argue that CNA "withdrew" or "waived" its breach-of-contract, bailment, and negligence causes of action in the district court, and chose instead to proceed solely on its Carmack cause of action.  This contention mischaracterizes the district court proceedings on this issue and is ultimately unsupportable and untrue.

In their motion for summary judgment, filed July 1, 2008, the Carriers stated near the end of their argument that CNA "ha[d] not asserted a cause of action under the Carmack Amendment." R. 78 at p. 25. This was a reasonable contention, given that CNA's complaint contained three express causes of action (breach of contract, bailment, and negligence) and only referred to Carmack in the jurisdiction section, not as a cause of action.  R. 38 (Complaint).  In its response memorandum, dated August 1, 2008, CNA answered that it had raised three causes of action *under* Carmack:

"It is acknowledged that [CNA]'s claims for breach of contract, negligence, and bailment are *encompassed* and preempted by the Carmack Amendment, and *as such*, [CNA] has no state law claims against [the Carriers], but rather one *comprehensive* claim *under* the Carmack Amendment."

R. 84 at 11 (emphasis added).  In their sur-reply, dated August 15, 2008, the Carriers did not contend that CNA had withdrawn or waived the three common-law causes of action but instead reiterated their belief that CNA had not pled Carmack and argued, in the alternative, for summary judgment on the common-law causes of action because Carmack preempted them.  R. 88 at 12.  In ruling on the motion, the district court held that Carmack encompassed the claims:

"CNA alleges causes of action against [the Carriers] sounding in breach of contract, bailment, and negligence, as encompassed by the Carmack Amendment. . . . Generally, and in part, the Carmack Amendment imposes liability for the actual loss or injury to property caused by rail carriers.  It is undisputed that the Cargo was damaged while in the possession of one or both Rail [Carriers]."

R. 102 at 3 (Memorandum Opinion, March 16, 2009).  The district court also included a footnote in this passage:

"While [the Carriers] argue preliminarily that CNA has failed to explicitly plead claims [under] the Carmack Amendment, the court is satisfied that CNA's Complaint clearly alleges comprehensive claims under the Carmack Amendment as opposed to individual

explained that the Subcontracting Clause did not make the rail carriers "immune from suit"; instead, it merely "obligate[ed] Corning to indemnify Hyundai for any resultant claims by any Subcontractor against Hyundai arising out of these same facts." Finally, the court explained that because the Clause Paramount, as it is written in the Service Contract, does not expressly extend COGSA's $500-per-package limit of liability to the subcontractor rail carriers, it does not apply to them; and because it applies only to damage occurring to inland cargo while that cargo is in Hyundai's custody, it does not apply to Hyundai in these circumstances. Consequently, the court denied the Carriers' attempts to limit their liability.

CNA had also moved for summary judgment, seeking to strike the Carriers' limitation-of-liability defenses on two theories: (1) that the Indemnification Clause in the Service Contract provided for full remuneration for the loss of the cargo; and (2) that the Carmack Amendment barred the rail carriers from any attempted limitation of liability.[13] The court rejected CNA's first theory, explaining that the Indemnification

---

common law causes of action."

R. 102 at 3 n.2 (quotation marks and citations omitted). Thus, CNA did not withdraw or waive its breach-of-contract, bailment, or negligence causes of action in the district court, but rather sought to preserve these causes of action as encompassed within the Carmack claim. Even if it could be said that CNA withdrew or waived these causes of action, CNA did so only on the understanding that Carmack preempted them and the case would proceed under Carmack. There is simply no basis to conclude, as the Carriers would have us do, that if the district court had deemed Carmack inapplicable at the summary judgment stage and left CNA with only the common law causes of action, that CNA would have nonetheless still withdrawn or waived those causes of action, i.e., that it would have dismissed its case altogether. Instead, as CNA has made clear throughout, CNA would have pursued these three common-law causes of action under diversity jurisdiction, as alleged in its complaint. *See also* fn.13 and fn. 14, *infra*.

[13]CNA moved for summary judgment on July 1, 2008, the same day the Carriers had filed their motion (see forgoing footnote), and argued that Carmack governed "by force of law." R. 79 at 16. The Carriers replied:

"With respect to the provisions of the Carmack Amendment applicable to rail carriers, it is notable that the Carmack Amendment does not 'govern' claims of breach of contract, bailment[,] and negligence; rather, the Carmack Amendment completely preempts such causes of action."

R. 85 at 23; *see also* R. 85 at 25 ("If the Carmack Amendment is applicable to the instant matter, then all of the claims pled by [CNA] are preempted."). CNA disagreed in its sur-reply, insisting that "these causes of action are found to be *authorized by* the Carmack Amendment and do not constitute 'state law causes of action.'" R. 87 at 12 (relying on *Travelers Prop. Cas. Co. v. A.D. Transp. Express, Inc.*, No. 04-5830, 2007 WL 2571957, *2 n.3 (D.N.J. Aug. 31, 2007) (holding the same)). As noted in the foregoing footnote, CNA did not withdraw or waive its breach-of-contract, bailment, or negligence causes of action in the district court. The Carriers contention that CNA did so is unfounded and untrue.

As an aside, we find it irritating and somewhat troubling that we had to explore this non-issue in such depth solely because the Carriers' counsel misrepresented it to us in his brief and at oral argument. To be sure, this was a complicated case with a lengthy procedural history and we will assume that counsel

Clause obligates Hyundai to indemnify Corning against third-party claims, but "has no bearing on Hyundai's liability to Corning for the loss of the Cargo." The court did not specifically decide the Carmack argument, but instead granted the motion based on its finding that the Service Contract's limitations of liability did not apply to any of the Carriers.

The case proceeded to a jury trial under a single Carmack cause of action.[14] CNA proved its Carmack prima facie case (i.e., the cargo was tendered in good condition, it arrived in damaged condition, and actual damages were quantified), so the burden shifted to the Carriers' to demonstrate one of the five excepted causes.[15] The Carriers attempted to prove that the damage was due to Corning's "improper" stowing and packing, inasmuch as it had left three inches of space (in the 20-foot container) between the crates and the end wall. CNA easily rebutted this contention. The real mystery was how the damage actually occurred — the railroads demonstrated that there had been no "humping," as had been speculated, nor was that even a plausible cause given that the containers had likely been positioned on the flatcar nose-to-nose. Also, the railroads demonstrated that no other containers on that train had been damaged. It appears likely that the containers were damaged after being removed from the flatcar, but the case was neither presented nor defended that way.

The jury found for CNA, holding the Carriers jointly and severally liable for $498,509.91 (which is exactly 75% of the $664,679.88 claim, to the penny). Notably, there is no provision under Carmack for contributory negligence or a partial award, and the court did not instruct the jury that it could issue a partial award, so this appears to have been improper. But CNA did not protest the verdict to the district court or appeal

---

was merely mistaken and not duplicitous in his contentions. Nevertheless, we encourage him to be more thorough and cautious in the future.

[14] As a final comment on the Carriers' contention that CNA withdrew or waived its breach-of-contract cause of action, we note that CNA actually sought to argue its breach-of-contract theory at trial. The district court refused, holding that this was an "either/or" proposition in which CNA was barred from arguing breach of contract by proceeding under Carmack.

[15] *See* Section II.A, *infra*, which presents Carmack's burden-shifting framework.

it here.  CNA did move for pre-judgment interest under New York law (9%) or, alternatively, federal law, but the district court denied that motion.

Meanwhile, the Carriers moved for judgment as a matter of law, arguing (1) that Carmack did not apply to Hyundai because it is not a rail carrier; (2) that the Surface Transportation Board had exempted intermodal rail transportation from Carmack unless the shipper selects it and pays extra for it, which Corning did not do; and (3) that Carmack does not permit lawsuits by Corning, the shipper, against Norfolk Southern or BNSF, because they are mere connecting carriers under Carmack.  Because the district court had already considered and rejected these arguments in its summary judgment decisions, the Carriers relied on an intervening Supreme Court decision to raise these issues anew, namely *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. --, 130 S. Ct. 2433 (June 21, 2010).  The district court denied the motions, explaining:

> [T]he court finds that [*Kawasaki*] *Kisen* . . . does not preclude the liability of Hyundai  [] under the Carmack Amendment in this case.  The [*Kawasaki*] case is inapplicable herein.  The court further finds that the evidence supports the jury's award of damages against all three defendants for the full value of the freight.

The Carriers appealed.  CNA cross-appealed, contesting the court's denial of prejudgment interest.

## II.

The preliminary and overriding question in this appeal concerns the meaning and application of the Carmack Amendment.  That is, we must determine whether Carmack actually applies here.

## A.

The Carmack Amendment to the Interstate Commerce Act, originally enacted in 1906 and currently codified at 49 U.S.C. § 11706, states in pertinent part:

> (a)      A rail carrier providing transportation or service subject to the jurisdiction of the [Surface Transportation] Board under this part

shall issue a receipt or bill of lading for property it receives for transportation under this part.

That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the [Surface Transportation] Board under this part are liable to the person entitled to recover under the receipt or bill of lading.

The liability imposed under this subsection is for the actual loss or injury to the property caused by - -

(1)     the receiving rail carrier;

(2)     the delivering rail carrier; or

(3)     another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.

Failure to issue a receipt or bill of lading does not affect the liability of a rail carrier.

A delivering rail carrier is deemed to be the rail carrier performing the line-haul transportation nearest the destination but does not include a rail carrier providing only a switching service at the destination.

(b)     The rail carrier issuing the receipt or bill of lading under subsection (a) of this section or delivering the property for which the receipt or bill of lading was issued is entitled to recover from the rail carrier over whose line or route the loss or injury occurred the amount required to be paid to the owners of the property, as evidenced by a receipt, judgment, or transcript, and the amount of its expenses reasonably incurred in defending a civil action brought by that person.

(c)(1)  A rail carrier may not limit or be exempt from liability imposed under subsection (a) of this section except as provided in this subsection. A limitation of liability . . . in a receipt, bill of lading, contract, or rule in violation of this section is void.

49 U.S.C. § 11706 (certain paragraph breaks added). These provisions also apply to motor carriers, *see* 49 U.S.C. § 14706(a)(1) (virtually identical for motor carriers), and

freight forwarders.[16]   *See Royal & Sun Alliance Ins. v. Ocean World Lines, Inc.*, 612 F.3d 138, 145 (2d Cir. 2010).

Though it might not be obvious from the text, "Carmack's original premise is that the [initial] receiving carrier is liable for damage caused by the other [subsequent] carriers in the delivery chain," *Kawasaki*, 130 S. Ct. at 2446.  The current version of Carmack makes the final, or "delivering," carrier liable to the shipper as well.  So, the aggrieved shipper need only sue the initial ("receiving") or final ("delivering") carrier and need not seek out the carrier actually at fault, nor must the plaintiff-shipper determine the circumstances by which the loss or damage actually occurred.

In a Carmack claim, the Supreme Court has set out a burden-shifting framework, in which the shipper may establish a prima facie case with a showing of three basic elements:

(1)     that the initial ("receiving") carrier received the cargo in good condition,

(2)     that the cargo was lost or damaged, and

(3)     the amount of actual loss or damages.

Thereupon, the burden shifts to the defendant-carrier to show both that it was not negligent and that the damage was instead due to one of five excepted causes:  (1) an act of God; (2) an act of terrorism or war; (3) an act of the shipper itself; (4) an act of public authority; or (5) the inherent vice or nature of the goods.  *Missouri Pac. R.R. v. Elmore & Stahl*, 377 U.S. 134, 137-38 (1964).

---

[16]There are no "freight forwarders" in this case, although both parties have, at times, improperly suggested that there are. Simply put, "[f]reight forwarders consolidate less than [a] carload [of] freight into carloads for shipment." *Chicago, Milwaukee, St. Paul & Pac. R.R. v. Acme Fast Freight*, 336 U.S. 465, 467 (1949); *see also id.* at n.2.  That did not happen here.  More specifically: "Freight forwarders generally make arrangements for the movement of cargo at the request of clients and are vitally different from carriers, such as vessels, truckers, stevedores[,] or warehouses, which are directly involved in transporting the cargo.  Unlike a carrier, a freight forwarder does *not* issue a bill of lading, and is therefore not liable to a shipper for anything that occurs to the goods being shipped." *Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126, 129 (2d Cir. 2000); *see also Norfolk S. R.R. v. Kirby*, 543 U.S. 14, 18 (2004) ("A freight forwarding company arranges for, coordinates, and facilitates cargo transport, but does not itself transport cargo.").

If the defendant-carrier meets this burden, it wins.  If not, then the shipper prevails based on its establishing the — very low threshold — prima facie case.  Recall that this named defendant-carrier (either the receiving or delivering carrier, or both) may attempt to recover any judgment from the intermediate carrier that was actually at fault for the loss or damage.  49 U.S.C. § 11706(b).

**B.**

"Common carrier liability" at common law was "of an extraordinary character, and cover[ed] every risk that the property c[ould] be subject to, except a loss by the act of God or by an unavoidable accident, [or] by the public enemy." *St. Louis, I. M. & S. R.R. v. Knight*, 122 U.S. 79, 88 (1887).  The carrier's alternative was to limit its liability by contract with the shipper, which, due to the "extraordinary liability which the law impose[d]," almost every carrier chose to do.  *See id.*  As a result, there was no uniform law for carrier liability, but instead, every case was dependent on the contract between the carrier and the shipper, typically embodied in a bill of lading.

It also bears mention that, pre-Carmack, there were hundreds of rail carriers operating their own rail lines as part of a massive, interconnected, nationwide system. So a shipment from Harrodsburg, Kentucky, to Tacoma, Washington, might pass through a half-dozen or more carriers, each of whom would operate under the contract (bill of lading) that the shipper had formed with the initial carrier, even though the shipper, and possibly even the initial carrier, had no knowledge of who these subsequent carriers might be.  This made it very difficult, if not impossible, for the shipper to locate the carrier actually responsible for loss or damage to the cargo during transit.

As enacted in 1906, the Carmack Amendment partially codified the common law by adopting a form of common-carrier liability, and restricted the carrier's right to limit that liability by contract.  In *Atlantic Coast Line R.R. v. Riverside Mills*, 219 U.S. 186 (1911), the Supreme Court considered an early challenge to Carmack and clarified that the Amendment placed full liability on the initial "receiving" carrier and prohibited any attempt to contractually limit that liability:

> Reduced to the final results, the Congress has said that a receiving [i.e., initial] carrier, in spite of any stipulation to the contrary, shall be deemed, when it receives property in one state, to be transported to a point in another, involving the use of a connecting carrier for some part of the way, to have adopted such other carrier as its agent, and to incur carrier liability throughout the entire route, with the right to reimbursement for a loss not due to his own negligence.

*Id*. at 205. The Court portrayed this as an agency construct: "The liability of the [initial] receiving carrier which results in such a case is that of a principal for the negligence of his own agents [i.e., the subsequent connecting or delivering carriers]." *Id*. at 206. Otherwise stated:

> In substance[,] Congress has said to such [initial] carriers: 'If you receive articles for transportation from a point in one state to a place in another, beyond your own terminal, you must do so under a contract to transport to the place designated. If you are obliged to use the services of independent carriers in the continuance of the transit, you must use them as your own agents, and not as agents of the shipper.'. . . The [initial] receiving carrier is, as principal, liable not only for its own negligence, but for that of any agency it may use, although, as between themselves, the company [i.e., carrier] actually causing the loss may be primarily liable.

*Id*. at 206-07. The Court rejected statutory and constitutional challenges. The Court's underlying, though unstated, premise is that there is a single contract for the shipment of the goods — either an actual contract, such as in a bill of lading, or a constructive contract based on Carmack's governing regulation — and that contract is between the shipper and only the initial (receiving) carrier.

Two years later, in *Adams Express Co. v. Croninger*, 226 U.S. 491, 505-06 (1913), the Court explained that Congress had, with the Carmack Amendment, fully preempted state law concerning the liability of interstate rail and road carriers. The Court also restated and clarified:

> The significant and dominating features of th[e] [Carmack] [A]mendment are these:

First.  It affirmatively requires the initial carrier to issue a receipt or bill of lading therefor, when it receives property for transportation from a point in one state to a point in another.

Second.  Such initial carrier is made liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it.

Third.  [The initial carrier] is also made liable for any loss, damage, or injury to such property caused by any common carrier, railroad, or transportation company to which such property may be delivered, or over whose line or lines such property may pass.

Fourth.  It affirmatively declares that no contract, receipt, rule, or regulation shall exempt such [initial] common carrier, railroad, or transportation company from the liability hereby imposed.

*Id*. at 504 (quotation marks omitted); *see also Norfolk & W. R.R. v. Dixie Tobacco Co.*, 228 U.S. 593, 594-95 (1913) (explaining that Carmack "requires any common carrier receiving property for transportation from a point in one state to a point in another to issue a receipt or bill of lading for the same; makes the [initial] receiving carrier liable for loss caused by any common carrier *in transitu*; and provides that no contract shall exempt it from the liability thus imposed").

Note that an actual or tangible bill of lading is not necessary to impose liability on the initial carrier under Carmack's plain terms, 49 U.S.C. § 11706(a) ("Failure to issue a receipt or bill of lading does not affect the liability of a rail carrier."), or *Atlantic Coast Line*'s constructive-contract premise, 219 U.S. at 206 ("If you receive articles for transportation . . . , you must do so under a contract to transport to the place designated."), and that *Adams Express*, 226 U.S. at 504, treats "contract, receipt, rule, or regulation" as equally powerless to limit the carrier's liability.  Thus, Carmack's requirement that the initial carrier issue the shipper a bill of lading is not a requirement to form an actual contract, though that is certainly acceptable and typically anticipated; it is a requirement that the initial carrier issue the shipper a receipt for the cargo as acknowledgment of the constructive contract making that carrier solely liable to the shipper for the entire carriage.

Because the shipper's contract (actual or constructive), as embodied in or symbolized by the initial carrier's bill of lading to the shipper, is the sole agreement governing the duration of the carriage and is between the shipper and only the initial carrier, making subsequent carriers mere agents of the initial carrier, any overlapping bill(s) of lading issued by any subsequent carriers are void. *Missouri, K & T R.R. v. Ward*, 244 U.S. 383, 387 (1917). That is:

> For the purpose of fixing the liability, the several carriers must be treated, not as independent contracting parties, but as one system; and the connecting lines become in effect mere agents [of the initial carrier], whose duty it is to forward the goods under the terms of the contract made by their principal, the initial carrier.

*Id*. at 387-88. Thus, in *Missouri, K & T*, the Court upheld the shipper's suit against two subsequent rail carriers under the terms of the initial shipper's bill of lading (contract) and voided a subsequent, overlapping bill of lading. *See also Texas & Pac. R.R. v. Leatherwood*, 250 U.S. 478, 481 (1919).

Note that the *Missouri, K & T* Court allowed the shipper to sue and recover from subsequent rail carriers, despite the absence of contractual privity between the shipper and those carriers:

> While the receiving carrier is . . . responsible for the whole carriage, each connecting [carrier] may still be sued [by the shipper] for damages occurring on its line; and the liability of such participating carrier is fixed by the applicable valid terms of the original bill of lading.

*Missouri, K & T*, 244 U.S. at 387. This is an expansion of Carmack beyond its terms: here, the subsequent carriers are not acting as agents for the initial carrier to complete the carriage; rather the initial carrier is made the agent for the subsequent carriers to bind them to a contract with the shipper.

Ten years later, in *Missouri Pacific R.R. v. Porter*, 273 U.S. 341 (1927), the Court considered an overseas export of goods shipped under a single through bill of lading (albeit separated into two sub-parts: one for rail transport from Arkansas to Georgia and another for sea transport from Georgia to England). The emphasis in *Porter*

was the Court's holding that Congress had occupied the entire field regulating interstate bills of lading, thereby invalidating any coincident state laws.[17]  In its analysis, however, the Court opined (perhaps in dicta) that the Carmack Amendment would not apply to the domestic overland part of an international, overseas shipment under a through bill of lading:

> The question is whether Congress has entered upon the regulation of provisions in bills of lading affecting liability of railroads for loss of property received by them for transportation over an interstate inland route to a seaport for delivery to a foreign vessel for ocean carriage to a nonadjacent foreign country. . . .  The defendants . . . rightly say that the Carmack Amendment . . . does not apply to such a shipment.

*Id*. at 345; *see also Reider v. Thompson*, 339 U.S. 113, 120 (1950) (Frankfurter, J., dissenting) (asserting that "[t]he conclusion of the *Porter* case" was "that the Carmack Amendment does not apply to an unbroken transaction of commerce with a nonadjacent foreign country").  Ultimately, the Court held that the situation presented was governed by the general statute concerning bills of lading and the federal courts' interpretation and application of that statute (i.e., federal common law).

If this passage were a legal holding, then Carmack plainly would not apply to the domestic portion of an overseas export under a through bill of lading, even if the initial receiving carrier otherwise fell within Carmack's coverage.  But the Court has, since then, expressly limited this as a holding and has treated this issue as an open question, so it is likely dicta.

In *Mexican Light & Power Co. v. Texas Mexican R.R.*, 331 U.S. 731 (1947), the Court considered a shipment of cargo under two overlapping bills of lading, as in *Missouri, K & T*, and again found the second bill void.  The first bill (from the initial carrier, Pennsylvania R.R.) covered carriage from Pennsylvania to Laredo, Texas, for export to El Oro, Mexico, with a caveat that the purchaser's agent would meet the shipment in Laredo, presumably to arrange for border crossing.  *Id*. at 732-33.  More

---

[17]Recall that the Court had already established, in *Adams Express*, 226 U.S. at 505, that the Carmack Amendment fully preempted state law concerning the liability of interstate rail and road carriers.

importantly, the shipper had paid Pennsylvania R.R. for shipment all the way to the Mexican border; i.e., through Laredo, but not actually out of the country (so not technically an export). When the subsequent ("connecting") carrier (Texas Mexican R.R.) stopped in Laredo, it issued another bill of lading, for the trip from Laredo to El Oro. But because Pennsylvania R.R. had paid Texas Mexican R.R. to deliver the shipment all the way to the border, Texas Mexican did not receive any further payment for the second bill of lading. At the border, the shipment was transferred to the National Railway of Mexico, in whose custody it was later damaged. The shipper sued Texas Mexican R.R. under Carmack, as the putative initial (receiving) carrier on the second bill of lading. The Court rejected Carmack liability for Texas Mexican, explaining:

> [U]nless the connecting carrier has received a consideration for the bill of lading in addition to that which flowed under the bill of lading issued by the initiating carrier, the Carmack Amendment makes such second bill of lading void. It can neither enlarge the liability of the connecting carrier nor contract that of the initiating carrier.
>
> . . .
>
> [Because] the so-called bill of lading [issued by Texas Mexican R.R.] did not evidence any new and independent undertaking, when judged by the rigid requirements by which bills of lading are valid under the Carmack Amendment, . . . the shipment over the Texas-Mexican [R.R. line] legally moved only under the original bill of lading[;] the Pennsylvania [R.R.] was never displaced as the initial carrier[;] and . . . therefore the Texas-Mexican [R.R.] was not liable for damage that occurred on the Mexican [National] Railroad.

*Id*. at 734-35. Note that this exclusion of Texas Mexican R.R. because it was merely a subsequent connecting carrier is a reversal from *Missouri, K & T*, 244 U.S. at 387, in which the Court permitted the shipper to sue two subsequent rail carriers. This is peculiar because the Court cited to, quoted from, and relied on *Missouri, K & T* in holding that the subsequent bill of lading was void.

In *Reider v. Thompson*, 339 U.S. 113 (1950), the Court considered an overseas import of goods shipped under two non-overlapping bills of lading; one for the sea transport from Buenos Aires to New Orleans and another for the rail transport from New

Orleans to Boston. The Court held that the absence of a through bill meant that the trip comprised two separate journeys, each covered by its own separate bill of lading, the second of which (the overland, rail portion) fell under Carmack, even though the first (overseas) part would not. The Court explained:

> There was no through bill of lading from Buenos Aires to Boston. . . .
> The contract for ocean transportation terminated at New Orleans.
> Having terminated, nothing of it remained for the new, separate, and
> distinct domestic contract of carriage to 'supplement' [i.e., overlap]. . .
> . If the various parties dealing with this shipment separated the carriage
> into distinct portions by their contracts, it is not for courts judicially to
> meld the portions into something they are not. The test is not where the
> shipment originated, but where the obligation of the carrier as receiving
> carrier originated. Thus it is not significant that the shipment in this case
> originated in a foreign country, since the foreign portion of the journey
> terminated at the border of the United States. The obligation as receiving
> carrier originated when respondent [railroad] issued its original through
> bill of lading at New Orleans. That contract of carriage was squarely
> within the provisions of the statute.

*Id*. at 117 (citations omitted). Because there were two independent contracts, the Court put the first (oversea) contract aside and considered only the second (entirely domestic, overland) contract individually. In this light, the Court was not considering "an unbroken transaction of commerce with a nonadjacent foreign country," *id*. at 120 (Frankfurter, J., dissenting), and it distinguished *Missouri Pacific R.R. v. Porter*, 273 U.S. at 345 (which had stated that Carmack would not apply to the "inland route to a seaport" as part of an overseas shipment in foreign commerce):

> The Court [in *Missouri Pacific R.R. v. Porter*] briefly alluded to the
> coverage of the Carmack Amendment. But the sole issue in [that] case
> was whether federal regulation of bills of lading had covered the field to
> the exclusion of state regulation of the same subject matter. The Court's
> discussion of the Carmack Amendment [in that case] does not control our
> decision in this case.

*Reider*, 339 U.S. at 116 n.1.

Nonetheless, the *Reider* Court's reasoning implied that the use of a through bill (from Buenos Aires to Boston) would have altered the outcome, suggesting that its

outcome could have been consistent with *Porter*, or at least not inconsistent with it. That is, had the shipper and ocean carrier entered a single through contract, from Buenos Aires to Boston, with the rail carrier at New Orleans a mere subcontractor to the ocean carrier, then the "obligation of the carrier as receiving carrier" *vis-a-vis* the shipper would have originated with the ocean carrier in Buenos Aires, and that carrier would not be subject to Carmack. Thus the shipper would have no grounds to invoke Carmack, either against the ocean carrier as the "receiving" carrier or against the rail carrier, a mere "connecting" carrier under the single through contract.

One lingering question would be whether Carmack applied separately to the rail component of the journey; that is, whether the rail carrier in New Orleans would have been a Carmack "receiving carrier" *vis-a-vis* the ocean-carrier-as-shipper, under the view that its obligation began in New Orleans.[18] Likely not. In *Reider*, 339 U.S. at 118, the Court found it important that, because "the shipment in this case could not have moved an inch beyond New Orleans under the ocean bill[,] the Carmack Amendment required [the rail carrier] to issue a . . . bill of lading for the carriage from New Orleans to Boston." Applying that reasoning the other way, under a through bill the shipment would certainly continue through New Orleans under the ocean bill, so the rail carrier would not have needed to issue a bill of lading to continue the carriage to Boston. Moreover, because the rail carrier would receive no additional consideration for the second bill of lading beyond that already paid by the ocean carrier under the through bill, that second bill would have been void under the Carmack analysis in *Mexican Light & Power*, 331 U.S. at 734. Regardless, the Court has since rejected this ocean-carrier-as-shipper argument expressly. *See Kawasaki*, 130 S. Ct. at 2445 ("A carrier does not become a [Carmack] receiving carrier simply by accepting goods for further transport from another carrier in the middle of an international shipment under a through bill.").

Thus, though far from definitive, a composite of the Court's Carmack case law as of *Reider* reasonably appeared to hold that Carmack: (1) fully preempted state law

---

[18]This theory was one of Justice Sotomayor's contentions in her dissent in *Kawasaki*, 130 S. Ct. at 2455.

as to an interstate rail carrier's liability; (2) mandated a single contract for carriage (i.e., the receiving carrier's bill of lading), such that any subsequent and overlapping contract would be void; (3) either allowed or disallowed a shipper's lawsuit against a "connecting" carrier, without clear explanation; and (4) would likely not apply to an overseas through contract, i.e., "an unbroken transaction of commerce with a nonadjacent foreign country." Unfortunately, the Court's ensuing cases concerning the Carmack Amendment confused as much as, or more than, they clarified.

In *Norfolk Southern R.R. v. Kirby*, 543 U.S. 14 (2004), the Court did not discuss or even mention the Carmack Amendment, but its analysis affects our Carmack analysis nonetheless. *Kirby* involved two overlapping bills of lading (i.e., contracts), both of which were through bills for an import of goods from Australia to Alabama via the port at Savannah, Georgia. The shipper (Kirby) hired an intermediary (ICC) to arrange the carriage; ICC hired an ocean carrier (Hamburg Sud) to perform the through carriage; and Hamburg Sud hired a rail carrier (Norfolk Southern) to complete the overland portion. ICC issued a bill of lading directly to Kirby; Hamburg Sud issued a second bill to ICC, without Kirby's knowledge. Each bill contained a Clause Paramount, extending COGSA's terms to cover the overland portions of the carriage, and a Himalaya Clause, extending the bills' limitations of liability to the subcontractors. Norfolk Southern operated under these two bills and did not issue any bill of its own. When the train derailed, Kirby sued Norfolk Southern for breach of contract and negligence. Norfolk Southern invoked the limitations of liability in the bills of lading. The Eleventh Circuit held that neither bill limited Norfolk Southern's liability to Kirby: the Hamburg Sud bill did not bind Kirby, and the ICC bill did not reach Norfolk Southern. But the Supreme Court disagreed and — interpreting the bills (contracts) under federal maritime law — reversed, holding that both bills limited Norfolk Southern's liability to Kirby. *Id.* at 36.

For our purposes, the most critical aspect of the opinion is the Court's complete omission of any reference to Carmack, which is particularly odd given that (1) it is a rail-carrier-liability case concerning the defendant rail carrier's attempt to limit its liability to the shipper, i.e., at the very core of Carmack; (2) the Court framed its first issue as a

conflict between federal and state law, *id.* at 22,[19] even though Carmack fully preempts state law concerning rail carrier liability,[20] (3) at least one *amicus* brief — the United States, acting on the Court's invitation — expressly brought the potential Carmack applicability to the Court's attention;[21] and (4) Carmack came up again at oral argument, albeit as merely a passing reference.[22] There can be little doubt that if Carmack applied it would significantly alter the analysis and outcome (e.g., prohibiting Norfolk Southern from limiting its liability by contract, voiding the overlapping Hamburg Sud bill of lading, and applying its burden-shifting framework to resolve Kirby's merits analysis). Consequently, the most reasonable explanation for the Court's omission is that it determined, *sub silentio*, that Carmack did not apply.

Instead, the Court applied COGSA in assessing the rail carrier's liability. The Court acknowledged that COGSA would not apply to the rail carrier "by its terms," unless the parties extended it by contract, and explained that the parties had done just that in the bills of lading:

> By its terms, COGSA governs bills of lading for the carriage of goods
> from the time when the goods are loaded on [to the ship] to the time

---

[19] *See Kawasaki*, 130 S. Ct. at 2438-39 ("*Kirby* held that bill of lading provisions permissible under COGSA can be invoked by a domestic rail carrier, despite contrary state law.").

[20] *See Missouri Pacific R.R. v. Porter*, 273 U.S. at 345; *Adams Express*, 226 U.S. at 505.

[21] The United States Solicitor General, accepting the Court's invitation to submit an *amicus curiae* brief, noted the potential applicability of the Carmack Amendment and advised that "[i]t is unsettled whether the Carmack Amendment applies to land transport under international, multimodal through bills of lading, such as the bills in this case." Brief of Amicus Curiae United States, *Norfolk Southern R.R. v. Kirby*, 2003 WL 22762727 at *11.

The Solicitor General further suggested that Kirby may have waived the Carmack issue when it "was not raised in the lower courts or in [its] brief in opposition." *Id.* Kirby replied that it had not waived the Carmack issue but, rather, had argued only the issues decided by the district court on summary judgment and raised to the circuit court on interlocutory appeal. Brief of Respondent Kirby, *Norfolk Southern R.R. v. Kirby*, 2003 WL 22977857 at *9 n.11.

It is questionable whether Kirby could have waived Carmack if it were, in fact, the controlling law. But assuming, *arguendo*, that Kirby could and did waive Carmack, even though it applied, it is unlikely that the Court would omit the controlling law without explanation. It is more likely that the Court found that Carmack did not apply.

[22] *See* Oral Argument Transcript, *Norfolk Southern R.R. v. Kirby*, No. 02-1028, 2004 WL 2348277 at *24. *See also* Wm. Baldwin, Comment, *Land Versus Sea; Carmack v. COGSA: Why the Carmack Amendment Should Not Apply to Inland Portions of Multimodal Shipments*, 82 Tul. L. Rev. 731, 743 (2007) (finding it peculiar that the *Kirby* Court ignored the Carmack aspect of the case "even though the issue was mentioned briefly during oral arguments").

when they are discharged from the ship. For that period, COGSA's 'package limitation' operates as a default rule. But COGSA also gives the option of extending its rule by contract. As COGSA permits, [ICC and] Hamburg Sud in [their] bill[s] of lading chose to extend the [COGSA] default rule to the entire period in which the machinery would be under [their] responsibility, including the period of the inland transport. [They] would not enjoy the efficiencies of the default rule if the liability limitation [they] chose did not apply equally to all legs of the journey for which [they] undertook responsibility. And the apparent purpose of COGSA, to facilitate efficient contracting in contracts for carriage by sea, would be defeated.

*Id*. at 29 (citations and certain quotation marks omitted). That is, to the extent that Carmack would have applied to the rail carriage in this case, the two "extension" clauses in the bills of lading — the Clause Paramount (contractually extending COGSA to the overland portions of the carriage) and the Himalaya Clauses (contractually extending COGSA to the rail carrier subcontractor) — trumped Carmack, rendered it wholly inapplicable (to the point of omission), and replaced it with COGSA.

Put another way, parties to a maritime contract for intermodal through carriage (i.e., ocean carriage containing a rail leg) can contract for COGSA coverage throughout, and exclude Carmack entirely, with a properly written Clause Paramount and Himalaya Clause. This premise begets three questions, which — not coincidentally — are the three questions the Court answered in *Kirby*: (1) what is a maritime contract; (2) what is a sufficient Himalaya Clause; and (3) can an intermediary really limit the subcontractor's liability to the shipper without the shipper's knowledge or consent.

The Court emphasized its "conceptual approach" to identifying maritime contracts: "so long as a bill of lading requires *substantial* carriage of goods by sea . . . it is a maritime contract [but] . . . [i]f a bill's *sea* components are *insubstantial*, then the bill is not a maritime contract." *Id*. at 27 (emphasis added). Most pertinent for our purposes here, this test draws no distinction between imports and exports, and actually rejects "a rule . . . that depends solely on geography." *Id*. As written, even if the *Kirby* shipment had left Alabama bound for Australia via the port at Savannah, one would expect the Court to have employed the same test and reached the same result.

Next, the Court held that Himalaya Clauses that are written broadly (i.e., covering "any" servant or contractor) must also be read broadly, to include any foreseeable subcontractors as intended beneficiaries, thus rejecting a rule of "linguistic specificity or privity." *Id.* at 31. That is, despite the parties' failure to specifically include a rail carrier in the Himalaya Clause, the term "any" and the necessity of rail carriage to complete the journey established the rail carrier's inclusion:

> Thus, the parties must have anticipated that a land carrier's services would be necessary for the contract's performance. It is clear to us that a railroad like Norfolk was an intended beneficiary of the ICC bill's broadly written Himalaya Clause. Accordingly, Norfolk's liability is limited by the terms of that clause.

*Id.* at 32. This was a direct reversal of the Eleventh Circuit's rule.

Finally, the Court held that the intermediary can act as the shipper's agent for the single, limited purpose of binding the shipper "to the liability limitations it negotiates with downstream carriers." *Id.* at 34. The shipper is not without recourse, however, as the shipper may sue the intermediary for any loss that exceeds the limit to which the intermediary bound the shipper. *Id.* at 35.

So *Kirby* appears to contain two of our recurring, underlying, but often unstated premises. The first would be that Carmack does not apply to an unbroken transaction of commerce with an overseas foreign country. The other is that a shipper may sue a subsequent carrier under a through contract (here a subcontractor's subcontractor), despite the absence of express contractual privity between the shipper and that carrier. *See Kawasaki*, 130 S. Ct. at 2456 n.8 (Sotomayor, J., dissenting) ("In *Kirby*, . . . we took as a given that the shipper could sue the inland rail carrier, even though the shipper was not a party to the rail carrier's bill of lading with an intermediary.").

In its most recent case, *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. --, 130 S. Ct. 2433, 2438-39 (2010), the Court considered this same scenario again — an overseas import of goods shipped under a through bill of lading — but this time addressed the Carmack issue. This case involved an import from China to

Oklahoma via the port at Long Beach, California.[23]  The shipper (Regal-Beloit) hired an ocean carrier (Kawasaki Kisen, a.k.a. K-Line) to perform the through carriage, and K-Line hired a rail carrier (Union Pacific R.R.) to complete the overland portion.  K-Line issued a through bill of lading to Regal-Beloit; Union Pacific did not issue any bill of lading.  The K-Line bill of lading contained five pertinent provisions:  (1) a Himalaya Clause, extending limitations of liability to K-Line's subcontractors (e.g., Union Pacific); (2) a Subcontracting Clause, authorizing K-Line to subcontract at its discretion; (3) a Clause Paramount, extending COGSA's terms to cover the entire journey, including the overland portions; (4) a Choice of Law Clause, designating Japanese law; and (5) a Forum Selection Clause, designating the Tokyo District Court.

When the train derailed in Oklahoma, Regal-Beloit sued K-Line and Union Pacific in California state court, and the case was removed immediately to federal district court.  After the district court dismissed based on the Tokyo Forum Selection Clause (premised on its underlying holding that the Clause Paramount extended the COGSA bill of lading to the rail portion of the journey and the Himalaya Clause extended it to cover Union Pacific), the Ninth Circuit reversed, holding that "the Carmack Amendment . . . trumped the [COGSA-based contract, and its] forum-selection clause." *Id*. at 2440.  On certiorari, the Court said "[t]he forum selection provision . . . gives rise to the dispute here," but framed the issue far more broadly as "whether Carmack applies to the inland segment of an overseas import shipment under a through bill of lading." *Id.*  And:

> The instant cases present a question neither raised nor addressed in *Kirby*.  It is whether the terms of a through bill of lading issued abroad by an ocean carrier can apply to the domestic part of the import's journey by a rail carrier, despite prohibitions or limitations in another federal statute.  That statute is known as the Carmack Amendment and it governs the terms of bills of lading issued by domestic rail carriers. 49 U.S.C. § 11706(a).

---

[23]There were actually four shippers, with four bills of lading, to four different locations in the Midwestern United States.  But because all relevant aspects are identical, we will treat this as one shipper and one shipment.

*Id*. at 2439.  The Court chose not to explain why this question was left unaddressed in *Kirby*, despite expressly acknowledging the similarity of the fact patterns, *id*. at 2438, and asserting that "[m]uch of what the Court said in *Kirby* applies to the present case[]," *id*. at 2442.  Moreover, the Court did not pick up or begin where *Kirby* left off, with the preeminence of maritime contracts.

The Court began by deconstructing the text of the Carmack statute, saying: "Carmack divides the realm of rail carriers into three parts:  (1) receiving rail carriers; (2) delivering rail carriers; and (3) connecting rail carriers."  *Id*. at 2442.  A "receiving rail carrier" is the initial carrier to receive the cargo from the shipper "at the journey's point of origin" and the only carrier that must issue a bill of lading pursuant to Carmack's requirements; a "delivering rail carrier" is the last carrier to deliver the cargo; and a "connecting carrier" is any and every carrier in between.  *Id*. at 2443.  The Court emphasized that the term "receiving rail carrier" is a statutory term of art, as defined above, not just "any rail carrier that in the colloquial sense 'received' the property from another carrier."  *Id*.

The Court then pivoted on the "receiving rail carrier" term, explaining that this term not only categorizes a particular carrier under Carmack (for purposes of identifying the liable carrier and the carrier responsible for the bill of lading), but also determines whether Carmack even applies to a shipment.  The Court held that Carmack applies only to shipments for which there is a receiving carrier required to issue a Carmack bill of lading — meaning, a road or rail carrier that is *both* subject to STB jurisdiction *and* receiving cargo from the shipper at the journey's point of origin.  *Id*. at 2443.  No "receiving carrier" means no Carmack bill of lading, which means no Carmack applicability (despite the involvement of carriers that would qualify as "connecting" or "delivering" rail carriers).  *Id*.; *see also id.* at 2449 (concluding that "[b]ecause the journey included no receiving rail carrier that had to issue bills of lading under Carmack,

Carmack does not apply").  This was a novel approach in that no court had previously assessed Carmack's applicability quite this way.**24**

So Carmack's threshold question is whether the carriage begins with an as-defined "receiving rail carrier"; i.e., as the Court put it, "ascertaining the shipment's point of origin is critical to deciding whether the shipment includes a receiving rail carrier," *id.* at 2443.  The analysis, to which we have added some bracketed explanatory language, follows:

> [F]or Carmack's provisions to apply the journey must begin with a receiving rail carrier, which would have to issue a Carmack-compliant bill of lading.  It follows that Carmack does not apply if the property is received [from the shipper, and the journey begins] at an overseas location under a through bill that covers the transport into an inland location in the United States.  In such a case, there is no . . . rail carrier [subject to the jurisdiction of the STB] that receives the property [directly from the shipper to begin the journey in the form of] domestic rail transportation, and thus no carrier that must issue a Carmack-compliant bill of lading.  The initial carrier in that instance receives the property at the shipment's [overseas] point of origin[, which is not subject to the jurisdiction of the United States STB,] for overseas multimodal import transport, not for domestic rail transport. . . .

> The present cases illustrate the operation of these principles.  Carmack did not require K Line to issue bills of lading because K Line was not a . . . rail carrier [hence, not subject to the United States STB's jurisdiction].  K Line[, an ocean carrier,] obtained the cargo [from Regal-Beloit, at the journey's point of origin] in China for overseas transport across an ocean [by ship] and then to inland destinations in the United States [by rail, via subcontractor Union Pacific].  K Line shipped this property under COGSA-authorized through bills of lading.  That K Line chose to use rail transport to complete one segment of the journey under these <u>essentially maritime contracts</u> does not put K Line within

---

**24**The dissent contested the majority's point-of-origin requirement for "receiving" carriers and insisted that Carmack applies to *any* carrier under the STB's jurisdiction, essentially any road or rail carrier in the United States:

> Once a first domestic rail carrier subject to the [Surface Transportation] Board's jurisdiction receives property in the United States, Carmack attaches, regardless of where the property originated.  Carmack then applies to any other rail carrier subject to the Board's jurisdiction in the chain of transportation, no matter whether the ultimate destination of the property is in the United States or elsewhere, for the period the carrier is traveling within the United States.

*Id*. at 2451 (Sotomayor, J., dissenting; joined by Stevens and Ginsburg, JJ.).

> Carmack's reach and thus does not require [K Line] to issue Carmack bills of lading [as a Carmack-defined 'receiving carrier'].
>
> As for Union Pacific, it was also not a receiving rail carrier under Carmack. The cargo owners conceded at oral argument that, even under their theory, Union Pacific was a mere delivering carrier, which did not have to issue its own Carmack bill of lading.  This was a necessary concession.[25]  A carrier does not become a receiving carrier simply by accepting goods for further transport from another carrier in the middle of an international shipment under a through bill.  After all, Union Pacific was not the 'initial carrier' for the carriage [from the point of origin].

*Id.* at 2444-45 (quotation marks and citations omitted; paragraph break and emphasis added).[26]

Despite the included reference to "essentially maritime contracts" and the associated allusion to *Kirby*, this Carmack-focused analysis is clearly different from *Kirby*'s "conceptual approach" to maritime-contract-applicability analysis, *see Kirby*, 543 U.S. at 27.  Under *Kirby*'s "conceptual approach," one would consider the entire journey described in the through bill as a single journey and decide whether that journey contained "substantial" sea carriage, thereby making the through bill a "maritime contract" and invoking the predominant interest in the uniform application of maritime law over conflicting interests (or laws).  *Id.* at 28-29.  Reciprocally, if the journey contained only "insubstantial" sea carriage, the through bill would be some other type of contract, *see id.* at 27 ("If a bill's *sea* components are insubstantial, then the bill is not a maritime contract."), perhaps a railroad contract if rail carriage were the predominant portion of the journey.  But under the analysis from the forgoing passage from *Kawasaki*, 130 S. Ct. at 2444-45, Carmack can *never* apply to a through carriage originating overseas, no matter how "insubstantial" the sea portion of the carriage might

---

[25]The inclusion of this sentence is curious, and both its basis and purpose are unexplained.

[26]It is perhaps noteworthy that the Court's express designation of Union Pacific as the Carmack-defined "delivering" carrier did not alter the analysis, which is based entirely on the Carmack receiving carrier.

be or how overwhelming the rail portion of the carriage might be,[27] because carriage originating overseas could not satisfy *Kawasaki*'s requirement for a receiving rail carrier.

At this point in its opinion, the Court had answered the question before it (as the Court had framed it), holding that Carmack does not apply to the inland segment of an overseas import shipped under a through bill of lading because there is no "receiving carrier." And the Court announced that it "need not address the instance where goods are received at a point in the United States for export." *Id*. at 2444. The Court, however, continued:

> If a [rail] carrier like Union Pacific . . . w[ere] . . . a receiving carrier under Carmack, this would in effect outlaw through shipments under a single bill of lading. This is because a carriage like the one in the present case would require two bills of lading: one that the overseas carrier (here, K Line) issues . . . under COGSA, and a second one that the first domestic rail carrier (here, Union Pacific) issues . . . under Carmack. *Kirby* noted the popularity of through bills of lading, in which cargo owners can contract for transportation across oceans and to inland destinations in a single transaction. The Court sees no reason to read COGSA and Carmack to outlaw this efficient mode of international shipping by requiring these journeys to have multiple bills of lading.

*Id*. at 2445. So, although expressly declining to decide whether Carmack applies to overseas exports that begin with a rail carrier (i.e., a Carmack receiving rail carrier), the Court nonetheless offered this bit of reasoning, which is as applicable here to exports as it is to imports.

Further, the Court declared that "the interpretation of Carmack the Court now adopts attains the most consistency between Carmack and COGSA." *Id*. at 2447. The Court's discussion is confined to *imports*, but it is difficult if not impossible to

---

[27]Consider, for example, an import from Havana, Cuba, destined for Tacoma, Washington, via the Port of Miami. Under the "conceptual approach" in *Kirby*, 543 U.S. at 27, the 230-mile sea portion would appear insubstantial in relation to the 3,300-mile overland portion, thereby signifying a railroad contract and not a maritime contract. Because numerous cases (from *Adams Express* to *Kirby*) have held that federal law (specifically Carmack) preempts state law, while *Kirby* would preclude federal maritime law and *Kawasaki* would preclude Carmack, it appears that some type of federal common law would govern this situation.

distinguish an *export* situation when viewed in light of these policy arguments. Consider this part of the discussion, which includes bracketed language relative to exports:

> Applying two different bill of lading regimes to the same through shipment would undermine COGSA and international, container-based multimodal transport. As *Kirby* explained, the international transportation industry clearly has moved into a new era — the age of multimodalism, door-to-door transport based on efficient use of all available modes of transportation by air, water, and land.

> If Carmack applied to an inland segment of a shipment [to or] from overseas under a through bill, then one set of liability and venue rules would apply when cargo is damaged at sea (COGSA) and another almost always would apply when the damage occurs on land (Carmack). Rather than making claims by cargo owners easier to resolve, a court would have to [first] decide where the damage occurred to determine which law applied. As a practical matter, this requirement often could not be met; for damage to the content of containers can occur when the contents are damaged by rough handling, seepage, or theft, at some unknown point. Indeed, [such an] approach would seem to require rail carriers to open containers at the port to check if damage has been done during the sea voyage [or, reciprocally, require sea carriers to open the containers at the port to check if damage had been done during the rail carriage]. This disruption would undermine international container-based transport. The Court will not read Congress' nonsubstantive recodification of Carmack in 1978 to create such a drastic sea change in practice in this area.

> Applying Carmack's provisions to international import [or export] shipping transport would also undermine the purpose of COGSA, to facilitate efficient contracting in contracts for carriage by sea. Th[is] case[] provide[s] an apt illustration. The sophisticated cargo owner[] here [i.e., Regal-Beloit] agreed to maritime bills of lading that applied to the inland segment through the Himalaya Clause and authorized K Line to subcontract for that inland segment on any terms whatsoever. [Regal-Beloit] thus made the decision to select K Line as a single company for [its] through transportation needs, rather than contracting for rail services [itself]. The through bills provided the liability and venue rules for the foreseeable event that the cargo was damaged during carriage. Indeed, [Regal-Beloit] obtained separate insurance to protect against any excess loss. . . .

> . . .

> Congress has decided to allow parties engaged in international maritime commerce to structure their contracts, to a large extent, as they

see fit. It has not imposed Carmack's regime, textually and historically limited to the carriage of goods received for domestic rail transport, onto what are essentially maritime contracts.

*Id*. at 2447-49 (paragraph break inserted; editorial marks, quotation marks, and citations omitted) (language relative to "exports" added in brackets). Clearly, the validity of these points does not turn on whether the shipment was an import or an export.

Thus, in light of the foregoing, the rule of *Kawasaki* appears to be that Carmack does not apply to the overseas shipment of goods — import or export — shipped under a single through bill of lading. This is consistent with the Court's prior dicta and outcomes. *See Missouri Pacific R.R. v. Porter*, 273 U.S. at 345; *Reider*, 339 U.S. at 117; *id.* at 120 (Frankfurter, J., dissenting) ("the Carmack Amendment does not apply to an unbroken transaction of commerce with a nonadjacent foreign country"); *Kirby*, 543 U.S. at 29. And lower courts are coming to that same view.

## C.

The courts that have considered whether Carmack applies to the inland segment of an overseas export have come down on both sides of the question; some initially applying Carmack based on the existence of the receiving carrier (i.e., a rail carrier that is *both* subject to STB jurisdiction *and* receiving cargo from the shipper at the journey's point of origin), but more recently rejecting it based on the arguments and rationale favoring COGSA and maritime contracts.

In the only Sixth Circuit case of significance on this issue, *American Road Service Company v. Consolidated Rail Corporation*, 348 F.3d 565, 568 (6th Cir. 2003), we held that Carmack "does not extend to a shipment under a through bill of lading unless a domestic segment of the shipment is covered by a separate domestic bill of lading." Because this opinion concerned an import, predated *Kirby* and *Kawasaki*, and included reasoning that has since been rejected, it is of limited value for our present purposes, even though it is generally consistent with *Kirby* and *Kawasaki*.

Since *Kawasaki*, the Southern District of New York has issued conflicting opinions on Carmack's applicability to the rail leg of an overseas export under a through bill. In *American Home Assurance Co. v. Panalpina, Inc.*, No. 07-cv-10947, 2011 WL 666388 (S.D.N.Y. Feb. 6, 2011), the court considered an export of forklifts, from Illinois to Australia via a California port, under a single through bill (containing a Himalaya Clause, a Clause Paramount, and COGSA coverage). When the train derailed, the shipper sued the rail carrier (BNSF) and the court relied on *Kawasaki*'s "receiving rail carrier" analysis, holding that "Carmack applies when the first rail carrier in the chain of transportation accept[s] the cargo at the shipment's point of origin" and that "Carmack provides the default legal regime governing the inland leg of a multimodal shipment originating within the United States and traveling on a through bill of lading." *Id.* at *4. This was not appealed. In *Hartford Fire Insurance Co. v. Expeditors International*, No. 10-cv-5643, 2012 WL 2861433 (S.D.N.Y. July 9, 2012), the court considered an export of solar panels, from Massachusetts to France via a New York port, under a single through bill, and granted summary judgment to a connecting carrier based on *Kawasaki*'s receiving-carrier analysis. The court added some reasons for rejecting Carmack:

> There are two additional reasons why Carmack does not apply in this instance.

> First, [the] plaintiff sued based upon the Bill of Lading issued by [the receiving carrier] and thus, is bound by its terms. The Bill of Lading clearly states that COGSA applies to [the receiving carrier] and its subcontractors.

> Second, . . . Congress has not imposed Carmack's regime onto what are essentially maritime contracts. Where a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce — and thus it is a maritime contract. The Bill of Lading — and the undisputed facts regarding the transport — evidence that a substantial part [of the contract] depended [on] carriage of the goods to France via sea.

> For all of those reasons, the [c]ourt finds that COGSA, not the Carmack Amendment, applies to the question of liability before the [c]ourt.

*Id*. at *6 (quotation marks and citations omitted).  This was not appealed.  Finally, in *Royal & Sun Alliance Insurance v. Service Transfer, Inc.*, No. 12-cv-97, 2012 WL 6028991 (S.D.N.Y. Dec. 4, 2012), the court considered the export of human plasma, from Kentucky to Austria via a Virginia port, under a single through bill, and rejected Carmack applicability even though the initial carrier (a truck, not a train) was subject to STB jurisdiction and putatively subject to Carmack, explaining:

> Being the first carrier does not necessarily make [initial-carrier] STI the 'receiving' carrier for the purposes of Carmack coverage.  Instead, the 'receiving' carrier is the 'principal' party to the contract governing the subject shipment and is responsible for the whole carriage.  In other words, it is the carrier which holds unity of responsibility for the transportation to [the] destination. . . .
>
> . . .
>
> Here, it is undisputed that STI was not the carrier responsible for the entire course of the shipment.  [The shipper] signed the single Waybill and paid [the coordinating carrier] a single 'all-in' through rate to handle the shipment of goods from Kentucky through to its final destination in Austria.  Therefore, STI did not function as a 'receiving' carrier, and the Carmack Amendment does not apply.
>
> This outcome is consistent with the Supreme Court's emphasis on efficiency in international maritime trade.

*Id*. at *4 (footnote and certain quotation marks omitted) (citing *Missouri K & T v. Ward*, 244 U.S. at 388, and *Mexican Light & Power*, 331 U.S. at 734).  While this proposition is somewhat difficult to reconcile with *Kawasaki*, the court did rely on *Kawasaki* for a follow-up (broader) proposition:

> Although the Supreme Court has not addressed the present circumstances, where goods are received at a point in the United States for export, the same reasoning [the Court used in rejecting Carmack in *Kawasaki*] applies to those contracts which create a single transaction for shipments across inland segments to overseas destinations.

*Id*.  This case was not appealed.  Based on these cases, the Southern District of New York seems to have done a turnabout on this, from applying Carmack originally to now rejecting it outright.

In *Norfolk Southern Railway v. Sun Chemical*, 735 S.E.2d 19 (Ga. Ct. App. 2012), the Georgia Court of Appeals considered an export of ink from Kentucky to Brazil via a port in Savannah, Georgia, under a through bill issued by the ocean carrier (subcontracting the rail carrier, Norfolk Southern).  When the train derailed, Sun Chemical sued Norfolk Southern under Carmack.  The Georgia court relied on *Kirby* to construe the bill of lading as a maritime contract, thereby precluding Carmack.  *Id.* at 27. The court also opined that while *Kawasaki* had expressly excluded the export scenario from its decision, it had nonetheless "also answered the broader question" and rejected Carmack applicability "in a case involving a through bill of lading for land and sea transit of goods, [in which] a domestic rail carrier not in privity with the owner of the goods . . . ha[d] made alternate contractual arrangements with the owner's agent." *Id.* at 25.  Finally, the court discussed in some detail the aforementioned cases from the Southern District of New York, concluding:

> We think that the Southern District of New York's more recent decision in *Expeditors* implements *Kirby*'s and *Kawasaki Kisen*'s objectives of promoting efficient maritime contracting more effectively than the earlier *Panalpina* decision, and that federal law requires us to uphold the bargained-for terms of the through bill of lading before us, including its binding of Sun to its downstream agent Riss's refusal of the Carmack liability offered by Norfolk Southern.

*Id.* at 27.  The end result, then, was the denial of Carmack applicability in this export case.

**D.**

This brings our attention back to the predominant question in the present case. Does Carmack apply to the road and rail legs of an overseas *export* shipped under a single through bill?  Although the Supreme Court left this question unanswered, it nonetheless provided guidance for future decisions, from which the prevailing trend is that Carmack does not apply to this situation.

Under the *Kirby* "conceptual approach," 543 U.S. at 27-29, we must first determine whether the shipping contract (bill of lading) at issue is a maritime contract[28] and, if so, enforce that contract under maritime law,[29] over any conflicting interests or laws.  Here, the Service Contract governs the carriage from Harrodsburg to Tainan, a journey which contains substantial sea carriage,[30] making the Service Contract a "maritime contract."  *See id*.  As a maritime contract, it would effectively preempt any Carmack applicability and instead govern by its own terms.  *Id*.  There can be little doubt that this theory comports with *Kirby*'s grand view, in general, of maritime contracts.

Any doubt would come from *Kawasaki*, particularly if we invert *Kawasaki*'s holding mechanistically to fit it to our facts, fail to follow it all the way through, and perhaps add language that is not actually there.  This presents a beguiling conclusion to which at least one court appears to have leapt, while overlooking the logical chasm beneath.  *See Panalpina*, 2011 WL 666388 at *4.

Under the *Kawasaki* "receiving-carrier approach," 130 S. Ct. at 2442-45, we determine whether the carriage begins with a Carmack-defined "receiving carrier"[31] and, *if not*, then disregard Carmack and enforce the contract on its terms.  *See also id.* at 2449 ("Because the journey included no receiving rail carrier that had to issue bills of lading under Carmack, Carmack does not apply.").  But what of our present facts — when the

---

[28]"Conceptually, so long as a bill of lading requires *substantial* carriage of goods by sea, its purpose is to effectuate maritime commerce — and thus it is a maritime contract." *Kirby*, 543 U.S. at 27 (emphasis added).

[29]The application of federal maritime law actually requires a "two-step analysis." *Kirby*, 543 U.S. at 23.  In the first step, the contract must be a "maritime contract." *Id*. at 23-27.  In the second, the case must not "so implicate local interests as to beckon interpretation by state law." *Id*. at 27-29.  There are no local interests in the present case, certainly none more pervasive than those in *Kirby*, and therefore this second step is easily satisfied here.

[30]The sea carriage portion of this journey, from Tacoma to Kaohsiung, is approximately 6,225 miles across the Pacific Ocean, which is undoubtedly "substantial."  This is not in dispute, nor is it open to reasonable dispute.  For comparison purposes, the overland portions of this journey total approximately 2,500 miles.  Having said that, we do not read *Kirby* as holding, nor do we hold here, that distances (alone or relative) are determinative of whether the sea portion of the journey is "substantial"; *Kirby* leaves the definition of "substantial" open to future consideration.

[31]Recall that a Carmack-defined "receiving carrier" is a road or rail carrier that is *both* subject to the jurisdiction of the United States Surface Transportation Board *and* receiving the cargo from the shipper at the journey's point of origin, such that it is required under Carmack to issue a Carmack bill of lading. *Kawasaki*, 130 S. Ct. at 2443.

carriage *does* begin with a Carmack-defined receiving carrier?  It is tempting simply to say that *Kawasaki* requires the result that Carmack *does* apply when carriage *does* begin with a Carmack-defined receiving carrier.  But *Kawasaki* does not hold that, expressly or otherwise.  In fact, *Kawasaki* expressly declined to so hold.  *Id.* at 2444 ("Today's decision need not address the instance where goods are received at a point in the United States for export.").  The opinion does state that "for Carmack's provisions to apply the journey must begin with a receiving rail carrier," *id.*, but even that is actually a limitation on Carmack, not an assertion of Carmack applicability.  Following the *Kawasaki* opinion all the way through — including the discussion of *Kirby* and COGSA — the inverse of the holding is almost as clear as the holding, albeit not as easily stated as a bright-line rule: when the journey does begin with a Carmack-defined receiving carrier, Carmack may still not apply to a multimodal through bill with a substantial sea component, for all the reasons set out in *Kirby*, such as the practical benefits of through shipments under a single bill of lading, the nuisance or dilemma that a disputed question of fact (i.e., the actual location of the loss or damage) could dictate the determination of the governing law concerning liability or venue, the inefficiencies of encouraging carriers to open the containers at transfer, and the power of congressional intent in drafting COGSA.  *Id.* at 2447-49.

Here, the Service Contract governs the carriage from Harrodsburg to Tainan, a journey which does begin with a Carmack-defined receiving road carrier, but which also implicates all of the *Kirby*-based concerns articulated in *Kawasaki*.  Because this is a through carriage under a single contract, applying Carmack to the road and rail portions[32] would cut the through bill into separate components (land and sea), effectively "outlawing" the use of the through bill.  *See Kawasaki*, 130 S. Ct. at 2445.  In this case, the containers never made it on to the ship, so the court was not presented with a contested question of fact concerning the location of the damage (land or sea) as a predicate to its foremost legal decision, but this would have been a significant issue if a Kaohsiung port employee had discovered the damage rather than the Tacoma

---

[32]Note that Carmack, by its own terms, applies to road and rail and would not apply to the oversea portion.

employee. Even under the present facts, the Carriers dwelled on CNA's inability to prove where the damage actually occurred.[33] And, just as *Kirby* and *Kawasaki* portend, under a scheme in which venue, choice of law, liability, etc., depend on the particular location of the loss or damage, the carriers proceeding with this on-going Service Contract would be well advised to open the sealed containers at transfer to protect their individual interests. Consequently, applying Carmack to the road and rail portions of this single, intermodal journey would undermine the benefits that Congress sought under COGSA and the parties sought in the Service Contract. *See id.* at 2449 ("Congress has decided to allow parties engaged in international maritime commerce to structure their contracts, to a large extent, as they see fit.").

As a result, based on the foregoing analysis, considered in light of the aggregation of Supreme Court case law, particularly *Kirby* and *Kawasaki*, as well as our general agreement with the post-*Kawasaki* federal and state court decisions, we hold that the Carmack Amendment does not apply to the road or rail leg of an intermodal overseas export shipped under a single through bill of lading.[34] Therefore, the district court erred by applying Carmack in this case as it did.

We also recognize, however, that the district court's initial decision in March 2009 was prior to *Kawasaki*, and its post-*Kawasaki* decision in September 2012 was without the benefit of the developing decisions from other courts.[35] While we must nonetheless conclude that the district court's decision was in error, we will also consider,

---

[33]In fact, the Carriers' begin their appellate brief to this court with these two sentences: "This case is about a shipment of freight that was damaged at some point in transit. It has not been established how the freight was damaged, where the freight was damaged, or exactly when it was damaged." And this is *after* a jury trial.

[34]In the district court, CNA had asserted, and the court had relied upon, Carmack as the basis for federal jurisdiction. But in its complaint, CNA also properly asserted diversity jurisdiction. 28 U.S.C. § 1332. Therefore, the inapplicability of Carmack does not divest this case of federal subject matter jurisdiction. And we would perhaps be remiss if we overlooked the fact that, because this is a maritime contract, federal jurisdiction exists pursuant to federal maritime law. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955) ("Since the [contract] here sued on is a maritime contract the Admiralty Clause of the Constitution brings it within federal jurisdiction.").

[35]Note, for example, how the Southern District of New York did a complete reversal, from applying Carmack in February 2011, *Panalpina*, 2011 WL 666388, to rejecting it in December 2012, *Royal & Sun*, 2012 WL 6028991.

based on the peculiar facts and circumstances of this case, whether some portion of that error was ultimately harmless. That is, whether it would be prudent to affirm some portion of the judgment in the context of a proper analysis.

### III.

In its complaint, CNA asserted three causes of action, purportedly arising under Carmack: breach of contract, bailment, and negligence. In ruling on the summary judgment motions, the district court held that because Carmack applied, it encompassed and preempted these separate causes of action and the case would proceed as a single Carmack cause of action.[36] As explained in the foregoing section, this was in error; Carmack did not apply by its own terms. Instead, the district court should have disregarded Carmack and enforced the Service Contract on its terms.[37]

Meanwhile, because it had applied Carmack and preempted the individual causes of action, the district court did not address the Carriers' motions for summary judgment on CNA's tort-based causes of action, bailment and negligence. The Carriers had argued that CNA could not maintain causes of action in tort because their duties arose solely by contract and, therefore, inasmuch as the Service Contract controlled the case, the only viable claim was for breach of that contract.

Under either federal maritime law or New York law,[38] a plaintiff cannot maintain a tort cause of action based on a defendant's breach of duties that arose solely out of

---

[36]*See* footnotes 12, 13, and 14, *supra*, for the background and particulars of this decision. *See also* Section II.A, *supra*, for Carmack's burden-shifting framework. At trial, CNA proved its Carmack prima facie case (i.e., the cargo was tendered in good condition, it arrived in damaged condition, and actual damages were quantified), so the burden shifted to the Carriers to demonstrate one of the five excepted causes. The Carriers attempted to prove that the damage was due to Corning's "improper" stowing and packing. CNA rebutted this contention and the jury found for CNA, awarding $498,509.91 in damages. The court awarded post-judgment interest, but denied pre-judgment interest.

[37]One term in particular bears mention and some clarification. The Choice of Law provision, § 13.A, dictates that New York state law and federal law govern. Of course, we just established in Section II.D., *supra*, that the Service Contract is a maritime contract pursuant to *Kirby*, 543 U.S. at 27-29, and therefore maritime law governs here. But we relegate this discrepancy to a footnote because "New York law . . . also requires application of federal maritime law to maritime cases." *Sundance Cruises Corp. v. Am. Bureau of Shipping*, 7 F.3d 1077, 1081 (2d Cir. 1993).

[38]The Service Contract specifies either federal or New York law in its choice of law provision.

their contract. *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1283 (2d Cir. 1994) (citing *East River S.S. Corp. v. Transam. Delaval Inc.*, 476 U.S. 858, 872-73 (1986) (federal maritime), and *Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 516 N.E.2d 190 (N.Y. 1987) (New York)); *see also Fireman's Fund Ins. Co. v. Orient Overseas Container Line Ltd.*, 763 N.Y.S.2d 427, 432 (N.Y. Civ. Ct. 2003). The plaintiff's cause of action against such defendant lies in breach of contract.

It is undisputed here that the Carriers' duties arose out of the Service Contract; this case contains no duty (nor breach of any duty) that was not anticipated by and included in the Service Contract. Consequently, we conclude as a matter of law that CNA cannot maintain any actions in bailment or negligence against the Carriers; its cause of action is limited to breach of the Service Contract. Therefore, the district court's denial of these tort causes of action — effectively dismissing them — was ultimately correct and we can affirm this part of the judgment. *See Schlaud v. Snyder*, 717 F.3d 451, 459 n.6 (6th Cir. 2013) (noting that we may affirm on any basis supported by the record).

CNA's sole colorable cause of action is for breach of the Service Contract. Had the district court denied Carmack applicability and dismissed the tort claims, it would have been left with CNA's breach of contract claim and the Carriers' defenses thereto. It is noteworthy that the only two parties to the Service Contract are CNA[39] as the shipper and Hyundai as the carrier. The rail carriers are unnamed "subcontractors" who neither negotiated nor signed the Service Contract. Due to their differing circumstances, we analyze the breach of contract claims against each differently.[40]

---

[39]Because CNA, as subrogee, is prosecuting this case as if it were Corning, we will refer to CNA as the merchant- or shipper-side party to the Service Contract, even though Corning is the actual party to the contract.

[40]Throughout the proceedings, the Carriers have had joint representation. More than once, the district court asked counsel whether separate representation was warranted. Each time, counsel (and the Carriers' representatives) answered that the co-defense posed no conflict of interest and that they were satisfied with the joint representation. Consequently, we proceed from the premise that the Carriers have waived any contention that their individual interests are inconsistent or that their defenses diverge in any significant way. The Carriers received the defense they wanted.

## A.

The rail carriers, Norfolk Southern and BNSF, are Hyundai's "subcontractors"; they are not parties to the Service Contract and, therefore, not in privity with CNA. But, as explained in *Kirby*, 543 U.S. at 32, because the journey contained substantial overland carriage, CNA and Hyundai "must have anticipated that a land carrier's services would be necessary for the contract's performance," thereby making Norfolk Southern and BNSF "intended beneficiaries."

"[T]o the extent a third-party qualifies as an intended beneficiary, it may enforce contract terms in its favor." *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 72 (S.D.N.Y. 2009) (citing Restatement 2nd of Contracts § 304) (footnote omitted). Thus, in *Kirby*, the rail carrier's status as an intended beneficiary (along with the "broadly written Himalaya Clause" in that case) allowed that rail carrier to invoke that contracts' limitation of liability clauses. *Kirby*, 543 U.S. at 32.

But, more to the point here, "qualifying as an intended beneficiary in no way *creates* contractual obligations on the part of the intended beneficiary." *In re M/V Rickmers*, 622 F. Supp. 2d at 72 (emphasis in original) (citing *Stein Hall & Co. v. S.S. Concordia Viking*, 494 F.2d 287, 291 (2d Cir. 1974) ("While the carrier and the shipper can extend certain contractual protections, such as the limitation on damages, to . . . third-party beneficiaries, they cannot contract to bind an unconsenting third party.")). The "methods for actually binding an intended beneficiary to a bill of lading are [1] showing that the third party exhibited acceptance to be so bound and [2] through an agency relationship with one of the contracting parties. Absent such a showing, contractual obligations cannot be imposed on an intended beneficiary." *Id.* (internal citation omitted).

Neither Norfolk Southern nor BNSF exhibited any agreement to be bound by the Service Contract (or the Hyundai Regular Form Bill of Lading incorporated therein). To the contrary, each contracted with Hyundai independently, under its own standard transportation agreement. Moreover, the Service Contract, § 4.A, expressly disclaims an agency relationship that would allow Hyundai to act as an agent on behalf of CNA,

asserting instead that "[Hyundai] shall be deemed an independent contractor with respect to [CNA]."[41]  To be sure, *Kirby*, 543 U.S. at 33-34, holds that an intermediary (such as Hyundai) necessarily acts as an agent for the shipper (here, CNA) in relation to the subcontractors (here, Norfolk Southern and BNSF), but not "in the classic sense." Rather, the intermediary acts as the shipper's "agent for a *single, limited* purpose: when [the intermediary] contracts with subsequent carriers for limitation on liability." *Id.* at 34 (emphasis in original).  That is, Hyundai was not CNA's agent for purposes of binding Norfolk Southern or BNSF.[42]

More importantly, *Kirby*, 543 U.S. at 31, held that "contracts for carriage of goods by sea must be construed like any other contracts:  by their terms and consistent with the intent of the parties."  Here, the Service Contract evinces the parties' clear intent *not* to bind subcontractors (such as Norfolk Southern and BNSF) to CNA, nor to hold them directly liable to CNA for damage to the cargo.  As just mentioned, the Service Contract deems Hyundai an independent contractor, and reiterates that "nothing herein contained shall be construed to be inconsistent with that relationship or status." This intent to bind only Hyundai is also evident in the Form Bill of Lading.  Section 4(B) allows Hyundai to subcontract at its complete discretion.  In Section 4(C), "[Corning] warrants that no claim shall be made against any of [Hyundai]'s Subcontractors or any Subcontractor's Subcontractor."   And Section 5(B)(2) specifically provides for Hyundai's liability for damage to the cargo by a subcontractor.  Considering these terms

---

[41]Of course, merely labeling Hyundai an "independent contractor" does not necessarily make it so. *See*, *e.g.*, *Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1121 (11th Cir. 2011) (discussing the factors commonly employed to distinguish an agent from an independent contractor).  Corning hired Hyundai to conduct the entire carriage, paid Hyundai a flat rate, and had no control over any aspect of Hyundai's performance.  Hyundai had complete control over the manner and means of performance; the selection, terms, payment, and right to terminate subcontractors; its equipment and materials; and the opportunity to profit.  Corning hired Hyundai to perform the predetermined carriage and paid the rate that Hyundai charged for completion of that carriage.  This was not an agency relationship.

[42]In Section II.B, *supra*, we acknowledged that the Supreme Court in *Missouri, K & T*, 244 U.S. at 387, treated the initial carrier as an agent for the subsequent carriers to bind them to the contract with the shipper, and accordingly upheld the shipper's lawsuit against them.  But that was a Carmack case — and an outlier in the Carmack line of cases at that — while this is a straight breach of contract without Carmack considerations.  Given the arm's length transactions between the rail carriers and Hyundai, including the rail carriers' transportation agreements on which their relationships are based, there is no basis to hold that Hyundai was acting as an agent for the rail carriers in this case.

in this Service Contract as being indicative of the intent of the parties, we find that these subcontractors are not directly liable to CNA.

We conclude as a matter of law that CNA cannot maintain a breach of contract action against the rail carrier defendants, Norfolk Southern and BNSF, in this case. The district court erred by denying their motion for summary judgment on this ground. We reverse the district court's decision and vacate the ensuing judgments against these two defendants, Norfolk Southern and BNSF.

**B.**

Hyundai is a party to the Service Contract and is in privity with CNA.[43] This is a straight forward breach-of-contract action in which we analyze the Service Contract, pursuant to federal maritime law, to determine the parties' agreed-upon liability scheme as applied to the present circumstances. For example, the contracts at issue in *Kirby* contained "broadly written" Clauses Paramount and Himalaya Clauses (as specifically worded in those contracts) that excluded Carmack, extended COGSA throughout the carriage, and even extended the contracts' provisions to the subcontractor's subcontractor despite the absence of contractual privity. Correspondingly, we must consider the specific clauses as written in the Service Contract and apply them appropriately.

We consider first the Clause Paramount, Form Bill of Lading § 2(B), which extends COGSA inland (beyond the tackles) "when the goods are in the custody of [Hyundai]." The district court held that because the cargo was in the custody of a rail carrier subcontractor when damaged, the Clause Paramount did not apply, inasmuch as,

---

[43]Again, because CNA, as subrogee, is prosecuting this case as if it were Corning, we refer to CNA as the merchant- or shipper-side party to the Service Contract, even though Corning is the actual party to the contract.

by its terms, it applies only to damage occurring to cargo in Hyundai's custody.[44]  The district court was correct in this interpretation.

We are further persuaded that this is correct upon consideration of the next provision at issue, which provides for Hyundai's liability when the goods are in the custody of a subcontractor:

> [W]ith respect to . . . damage caused during the handling, storage, or carriage of the Goods by [Hyundai]'s Subcontractor, such liability shall be to the extent to which such Subcontractor would have been liable to [CNA] if it had made a direct and separate contract with [CNA] in respect of such handling, storage, or carriage.

Form Bill of Lading § 5(B)(2).  That is, Hyundai proposed (in its Regular Form Bill of Lading), and the parties agreed to, a separate scheme to govern Hyundai's liability for damage to the cargo under circumstances in which a subcontractor, such as a road or rail carrier, damaged the goods.[45]

So pursuant to this provision, Hyundai is liable "to the extent to which [a road or rail carrier] would have been liable to [the shipper] if it had made a direct and separate contract with [the shipper]" for that carrier's portion of the journey.  Of course, if a road or rail carrier made a separate contract with the shipper for carriage, it would be subject to Carmack.  *See*, *e.g.*, *Reider*, 339 U.S. at 117.  Under Carmack, it would be unable to limit its liability by contract.[46]  49 U.S.C. § 11706(c)(1); *Adams Express*, 226 U.S. at

---

[44] In so doing, the district court further concluded *as a matter of contract interpretation* that the Service Contract's limitation-of-liability provisions did not apply in the present circumstances.  That is, even though the district court applied Carmack as the overriding law and CNA had moved to deny the limitation of liability on the basis that Carmack prohibits such limitations, *see* 49 U.S.C. § 11706(c)(1), the district court did not base this decision on Carmack.

[45] At oral argument, the Carriers' counsel speculated that this provision was merely a means by which CNA could sue the subcontractors directly, thus governing the subcontractors' liability.  We do not read this provision that way.  Moreover, because, in § 4(C), "[CNA] warrant[ed] that no claim shall be made against any of [Hyundai]'s Subcontractors," we must conclude that § 5(B)(2) governs *Hyundai's* liability for the subcontractors' conduct.

[46] Certainly, a rail carrier may avoid Carmack liability for container carriage if it offers Carmack coverage to the shipper and the shipper declines.  *See Babcock & Wilcox*, 557 F.3d at 141 n.6 (relying on 49 U.S.C. § 10502(e) and § 11706).  Because Hyundai stands in the shoes of the rail carrier here, Hyundai could have either been compensated for or avoided Carmack liability by offering Carmack coverage to the shipper, Corning/CNA.  But because Hyundai did not offer any Carmack coverage option, Hyundai cannot avoid Carmack liability on this basis.  Moreover, the district court determined as a matter of contract

504. And the court would ultimately determine the liability pursuant to Carmack's burden-shifting framework. *See Missouri Pac. R.R.*, 377 U.S. at 137-38.

Based on the foregoing, we conclude as a matter of law and pursuant to the terms of the Service Contract, that CNA's claim for breach of contract by Hyundai for "damage caused during the handling, storage, or carriage of the Goods by [Hyundai]'s Subcontractor" — be it DHL, Norfolk Southern, BNSF, or TMBR — must be resolved under Carmack. Because the district court proceeded on the theory, which the jury later confirmed by its verdict, that the damage occurred while the cargo was in the custody of either Norfolk Southern or BNSF, the court was ultimately correct in its application of Carmack to determine Hyundai's liability and we can affirm this portion of the decision. *See Schlaud*, 717 F.3d at 459 n.6 (we may affirm on any basis supported by the record).

While the district court erred by applying Carmack to this case as a general principle, that error was ultimately harmless because the court would have properly applied Carmack under a straight forward breach-of-contract action. *See* Fed. R. Civ. P. 61 (instructing that "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights"); 28 U.S.C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); *see also Rosencrantz v. Lafler*, 568 F.3d 577, 588-92 (6th Cir. 2009) (discussing harmless error). We affirm the district court's judgment against Hyundai, in favor of CNA, on the jury award of $498,509.91 in damages.

## IV.

CNA contends that the district court erred by denying its motion for prejudgment interest. In its denial, the district court's stated rationale was that "[t]he verdict was

---

interpretation that the Service Contract's limitations of liability did not apply to the present circumstances, regardless of Carmack. We agree and affirm that portion of the district court's decision.

rendered in this case on the Carmack Amendment claim only [and] [t]he Carmack Amendment does not specifically provide for the recovery of pre-judgment interest . . . ." As explained in the foregoing sections, the district court erred by applying Carmack to this case as a general principle; this case is properly decided on the Service Contract and the applications of the pertinent provisions therein.  Therefore, the decision is not based on "the Carmack Amendment claim only," and this aspect of the district court's rationale for denying prejudgment interest is insupportable.  The Service Contract controls.

We are also unpersuaded by the court's additional rationale that "this is not a case in which one party has had the use of the other party's money."  By failing to reimburse Corning for the cost of the damaged glass at the time of the accident (and thereby forcing Corning to file a claim with CNA), Hyundai did have the use of Corning's (or CNA's) money during that time.  Having said that, the award of prejudgment interest is a matter of discretion, *see Werner Enters. v. Westwind Maritime Int'l*, 554 F.3d 1319, 1328 (11th Cir. 2009), and additional factors may affect the determination.

We necessarily remand this case for reconsideration of the question of prejudgment interest in light of the pertinent provisions of the Service Contract as applied to the present decision.  We also direct the court's attention to *In re ClassicStar Mare Lease Litigation*, 727 F.3d 473, 494-97 (6th Cir. 2013), which amplifies our current view of prejudgment interest.

## V.

Based on the foregoing, we **AFFIRM** the judgment against defendant Hyundai, **REVERSE** and **VACATE** the judgments against defendants Norfolk Southern and BNSF, and **REMAND** this case to the district court so that it may reconsider the question of prejudgment interest.

---

**DISSENTING IN PART**

---

KATHLEEN M. O'MALLEY, Circuit Judge, dissenting in part. I agree with most of the findings in the thorough and thoughtful majority opinion. Specifically, I agree that the Carmack Amendment does not apply to the road or rail leg of an intermodal overseas export shipped under a single through bill of lading. I also agree that CNA cannot maintain actions in bailment or negligence against the carriers, and that its cause of action is limited to a claim for breach of the Service Contract. Finally, I agree that CNA's breach of contract action is available only against Hyundai, not the rail carrier defendants. And, I agree that Hyundai is liable, by contract, for the subcontractor's conduct. It is the next conclusion—the one set forth in section III.B. of the majority opinion—with which I cannot agree.

I do not believe that Hyundai's contractual liability to Corning (and, hence to CNA) "must be resolved under Carmack" as the majority holds. Instead, because Hyundai was authorized as Corning's agent to limit the subcontractor's liability, and did so by and on behalf of Corning, I believe Hyundai's liability is limited to that same extent. Because I believe the majority misreads Form Bill of Lading § 5(B)(2) and improperly construes the extent of Hyundai's liability, I respectfully dissent from the majority's conclusion that Hyundai is liable to CNA to the full extent of the liability specified in the Carmack Amendment.

Form Bill of Lading § 5(B)(2) states that, "with respect to . . . damage caused during the handling, storage, or carriage of the Goods by [Hyundai]'s Subcontractor, such liability shall be to the extent to which such Subcontractor would have been liable to [Corning] if it had made a direct and separate contract with [Corning] in respect of such handling, storage, or carriage."[1] Based on this provision, the majority finds Hyundai liable to CNA to the extent of liability imposed by the Carmack Amendment. The majority finds that, if the rail carriers had separately and directly contracted with

---

[1] The Service Contract incorporates Hyundai's Form Bill of Lading.

Corning, those contracts would have been subject to the Carmack Amendment because the subcontractors are domestic rail carriers. Maj. Op. at 48–49. As such, the majority concludes that these rail carriers would have been unable to limit their liability by contract in the absence of an express waiver by Corning, and that Hyundai also may not limit its pass-through liability. *Id.* The majority reaches this conclusion based on the proposition that "a rail carrier may avoid Carmack liability for container carriage if it offers Carmack coverage to the shipper and the shipper declines." *Id.* at 51 n.46 (citation omitted). Because it finds that "Hyundai stands in the shoes of the rail carrier here," the majority concludes that Hyundai cannot avoid Carmack liability on this basis because "Hyundai did not offer [Corning] any Carmack coverage option." *Id.* What the majority fails to recognize, however, is that the rail carriers *did* offer Carmack coverage to Corning, through its agent, and that Corning affirmatively waived that coverage. While Hyundai must fulfill the carrier's obligations to Corning, it actually stood in Corning's shoes for purposes of defining the scope of that liability.

The Service Contract states that "[p]arties agree to allow [Hyundai] to contract or *establish agency* as may be necessary to provide inland transportation or door to door services in international commerce if called for in the rates spelled out in Appendix C." Service Contract, RE:78-6, Page ID #496 at ¶ 2(A) (emphasis added). Then, section 4(B) of the Form Bill of Lading provides Hyundai with the authority to "subcontract *on any terms* the whole or any part of the handling, storage[,] or carriage of the Goods and any duties undertaken by [Hyundai] in relation to the Goods." (emphasis added). Further, Form Bill of Lading § 5(A) states that "[Hyundai], in making arrangements for transportation . . . or handling before loading or after discharge acts only as [Corning's] agent and assumes no responsibility therefor." These provisions, taken together, allowed Hyundai to *establish agency* for purposes of entering into agreements with other carriers *on any terms*. And Hyundai, acting as Corning's agent as outlined in section 5(A), proceeded to subcontract the rail portions of the shipment. Hyundai, fully within its authority, then refused full Carmack liability from the subcontractors, and, accordingly, limited the liability of the subcontractors. Consequently, the analysis should end here, as we know the amount of liability Corning set for the subcontractors through its agent,

Hyundai. Although Hyundai is ultimately accountable for that liability, it was also authorized to limit its terms.

While the majority points out that Hyundai is defined at places in the Service Contract as an independent contractor, nothing precluded Hyundai from acting as *both* an independent contractor and an agent, depending upon the activity in question. "[N]othing about the title independent contractor invariably precludes someone from being an agent under appropriate circumstances." *United States v. Hudson*, 491 F.3d 590, 595 (6th Cir. 2007) (citing Restatement (Second) of Agency § 2(3) ("An independent contractor . . . may or may not be an agent.")); *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 219 (6th Cir. 1992) (noting that "a person may be both an independent contractor and an agent"). Thus, the fact that Hyundai acted as an independent contractor who could not bind the carriers to a direct contract with Corning—pursuant to its express authorization to do so in both the Service Contract and the Form Bill of Lading—does not conflict with Hyundai's ability to act as the agent of Corning for purposes of limiting the scope of the carriers' liability. Hyundai can and did properly limit the subcontractor's liability on behalf of Corning.[2]

In this regard, I specifically disagree with the majority's conclusion that Form Bill of Lading § 5(B)(2) placed Hyundai in the "shoes" of the rail carriers. Section 5(B)(2) states that Hyundai's "liability shall be *to the extent* to which the *Subcontractor* would have been liable to [Corning] if it had made a direct and separate contract with [Corning] in respect of such handling, storage, or carriage." (emphases added). This provision does not actually place Hyundai in the subcontractor's shoes, it only holds Hyundai liable *to the extent* the *subcontractor* would have been liable to Corning under such circumstances. As such, the hypothetical analysis called for under § 5(B)(2) should not consider whether Hyundai itself offered Corning any Carmack coverage option; it should look to what the *subcontractor* offered to Corning through its agent. It appears, moreover, that the purpose of this provision was to assist Hyundai in segmenting liability

---

[2]While it may seem odd that Corning would give Hyundai the authority to limit its *own* liability by limiting that of the carriers, that is precisely the arrangement Corning chose. Notably, this is consistent with Corning's overall choices—waiving liability in return for lower shipping charges and choosing, instead, to buy insurance from CNA to cover any damages to the goods transported.

among the subcontractors in circumstances where the parties could assess the damage to the goods against a *particular* subcontractor; the majority reads far too much into it.

For these reasons, I believe that Hyundai is contractually liable to CNA to the extent, and only to the extent, acting on behalf of Corning, it held the carriers liable: to the tune of $10,000.00, and no more. *See* BNSF Rules, RE: 79-12 at Item 64, Page ID #769; NS Rules, RE: 78-14 at Item 8.6.2, Page ID #591. I note, moreover, that, even if we were to assume that Hyundai did not act as Corning's agent when limiting the carriers' liability, we could not, as the majority does, assume that Corning would not have waived Carmack liability if it had contracted directly with the rail carriers. I believe that we would need to remand for a determination of the amount of liability Corning *would have contracted for* with the subcontractors based upon a consideration of all relevant evidence. On this point, the agreement between Corning and Hyundai is highly relevant. Of particular note, Corning did not request full liability under COGSA by declaring the full value, despite having the option of receiving a greater scope of liability in return for payment of a higher fee. Instead, Corning purchased additional insurance through CNA to cover this difference in liability coverage, opting to pay lower freight costs. Thus, it seems likely Corning would have taken the same approach in a direct and separate contract with the subcontractors vis-à-vis its option for Carmack liability, with its attendant higher cost, by declining full Carmack liability.

For the foregoing reasons, I respectfully dissent from the majority's finding that Hyundai is liable to CNA under the Carmack Amendment; I would limit Hyundai's liability to $10,000.